**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **Case No. 16-32-2** |
| v. | ) | **Section "M"** |
| | ) | |
| **LOUIS AGE JR.** | ) | **Judge Barry W. Ashe** |
| **LOUIS AGE III** | ) | |
| **RONALD WILSON JR** | ) | |
| **KENDRICK JOHNSON** | ) | |
| **STANTON GUILLORY** | ) | |

## 28 U.S.C.S. 1867(D) DECLARATION OF RICHARD BOURKE

I, Richard Bourke, declare and state as follows:

1) I am over the age of eighteen and am appointed counsel for the defendant, Louis Age Jr.  I have received from the Eastern District of Louisiana (EDLA) jury administrator 75 electronic files, made up of 166,669 pages of PDF documents, 6 Excel spreadsheets and 1 Word document. I have also received a 24 page transmittal letter along with a hard copy of the whole of, or the first page of, each of the documents provided electronically.

2) This material was provided in compliance with this court's order for disclosure (Doc 384) and is helpfully labelled in accordance with the numbering of the requests contained in the Schedule to the defense motion for access to jury selection data.  Throughout this declaration I refer to the schedule number used in the documents produced by the Jury Administrator.

3)  Based upon my review of these documents to date, I make the following sworn statement of facts.

## I.     Community population of eighteen-year-olds in Eastern District by Race and Sex

4) At Schedule I.9a, the 2015 demographic break down of race and gender for citizens 18

years and older (18+) for each of the thirteen parishes in the Eastern District of Louisiana is provided as follows:

|  | Male | Female | Total[1] |
|---|---|---|---|
| Black | 13.9% | 17.1% | 31.1% |
| White | 31.2% | 33.0% | 64.2% |
| All Others | 2.3% | 2.4% | 4.7% |

**Table 1: Race and Gender of 18+ Citizens in EDLA**

5) These total race and gender figures are confirmed in Schedule I.8a, where they are reproduced in the March 31, 2017 AO-12 form, promulgated for comparison with the qualified jury wheel.

## II.     Master Wheel

6) According to Schedule I.11 and I.13a, the Master Wheel used to summons grand jurors in Mr. Age Jr.'s case was refilled on December 15, 2016.[2]  This Master Wheel is referred to as the 2017 Master Wheel.  The race and gender report for the Master Wheel indicates that it had a racial makeup consistent with that of the district.  The Master Wheel was filled with 60,000 names.  From this Master Wheel was then generated a Qualified Wheel – a list from which jury pools were created for jury selection.

## III.     Qualified Wheel

7) According to the documents provided by the clerk's office, names are added to and removed from the Qualified Wheel throughout the life of the Master Wheel and there is no report readily generated from the Jury Management System program that precisely lists all jurors on the Qualified Wheel at the time that the jury panel from which Mr. Age Jr.'s grand jury was selected

---

[1] Note that the percentages are rounded to one-tenth of a percentage point and so, for example, the total column appears slightly different to the sum of the male and female columns.  This is a function of rounding.
[2] Names were drawn from the source list on November 30, 2016 and the Master Wheel filled on December 15, 2016. See Transmittal Letter at p.4.

was drawn.[3]

8) According to Schedule I.17, names were selected from the Qualified Wheel for the grand jury that indicted Mr. Age Jr. on April 19, 2017.

9) According to Schedule I.8a, the AO-12 completed March 31, 2017, there were 1,992 prospective jurors on the Qualified Wheel, and race was known for 1,989 of these prospective jurors.[4]  The Qualified Wheel from which Mr. Age Jr.'s grand jury was drawn had the following demographic breakdown:

|  | Male | Female | Total[5] |
|---|---|---|---|
| Black | 6.59% | 12.67% | 19.26% |
| White | 36.00% | 40.17% | 76.47% |
| All Others | 2.26% | 1.96% | 4.2% |

**Table 2: Race and Gender of March 31, 2017 Qualified Wheel in EDLA**

10) It can be seen that there is a massive underrepresentation of black jurors in the Qualified Wheel as at March 31, 2017 when compared with the 18+ population of the Eastern District of Louisiana.  For ease of comparison, the table for the Qualified Wheel as at March 31, 2017 is reproduced below with an additional column, the total by race of 18+ citizens in the Eastern District of Louisiana.

|  | Male | Female | Total qualified | **Total 18+ in Community** |
|---|---|---|---|---|
| Black | 6.59% | 12.67% | 19.26% | **31.1%** |
| White | 36.00% | 40.17% | 76.47% | **64.2%** |
| All Others | 1.96% | 0.05% | 4.27% | **4.7%** |

**Table 3: Race and Gender of March 2017 Qualified Wheel Compared to EDLA Population**

11) As can be seen, a random selection from the 18+ citizens in the Eastern District of Louisiana would be expected to produce a Qualified Wheel made up of approximately 31.1% black

---

[3] See Clerk's Transmittal Letter at p.2, I.5b; p.5, I.14.

[4] The race of three jurors are unknown and are omitted from the percentage calculations.  In 2014 the Judicial Conference adopted the approach of omitting those of unknown race from the demographic calculations.

[5] The race of three jurors are unknown and are omitted from the percentage calculations.

prospective jurors. Instead, the Qualified Wheel contained only 19.26% black prospective jurors. This is an absolute disparity[6] of -11.84%. The table also shows that white jurors were overrepresented by an absolute disparity of +12.27%.  As a result, the proportion of white to black jurors on the qualified list was not twice as many white folks, as is seen in the community, but four times as many white prospective jurors as black prospective jurors.

12) The disparity can be expressed in terms of the actual number of prospective jurors excluded from consideration for service, rather than percentages.  For the sample of 1,989 qualified jurors whose race was known, representation consistent with the racial demographics of the community would be expected to have resulted in 619 black prospective jurors, instead of only 383.  Similarly, expected white representation in the qualified list would be expected to be 1,277 jurors, rather than 1,521 white jurors.  Thus, there are 236 fewer black jurors and 244 more white jurors in the qualified list of 1,989 jurors – a racial turnaround of 480 jurors out of the 1,989 in the Qualified Wheel.

|  | Expected Percentage | Expected Jurors | Actual Percentage | Actual Jurors | Juror Disparity |
|---|---|---|---|---|---|
| Black | 31.1% | 619 | 19.26% | 383 | -236 |
| White | 64.2% | 1277 | 76.47% | 1521 | +244 |
| All Others | 4.7% | 93 | 4.27% | 85 | -8 |

**Table 4: Disparity from Expected Number of Black Jurors in March 2017 Qualified List**

13) The effect on the fair cross-section of the underrepresentation of black jurors and the extent of exclusion of black citizens from jury service is further illuminated by considering the relative disparity – that is, what proportion of the particular racial group is excluded from jury service by their omission from the qualified jury list.  The following table shows the relative

[6] Absolute disparity is calculated by subtracting the percentage of black jurors in the Wheel from the percentage of black 18+ citizens in the EDLA: a negative number shows an underrepresentation.  Comparative disparity, by contrast, describes the rate of underrepresentation.  It is calculated by dividing the absolute disparity by the percentage of black 18+ citizens in the EDLA.  *See, for example, Berghuis v. Smith*, 559 U.S. 314, 322-23 (2010).

disparity in race and gender representation in the March 31, 2017 qualified jury list, when compared with the 18+ citizen population in the district.   The relative disparity in the representation of black prospective jurors is -38.1%.

|            | Male   | Female | Total  |
|------------|--------|--------|--------|
| Black      | -52.6% | -25.9% | -38.1% |
| White      | +15.4% | +21.7% | +19.1% |
| All Others | -1.7%  | -18.3% | -10.6% |

**Table 5: Underrepresentation of Black 18+ Citizens in EDLA March 2017 Qualified List**

14) The size and direction of the racial disparity created by the underrepresentation of black jurors and overrepresentation of white jurors is graphically represented in the chart below:



**Figure 1: Underrepresentation of Black and Over Representation of White Jury Pool Members in EDLA**

15) In essence, more than a third of black prospective jurors were excluded from consideration for jury service in the EDLA in March 2017 by their omission from the Qualified Wheel.

16) As the Supreme Court explained in *Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977), the statistical significance of this underrepresentation can be analyzed using binomial

distribution.[7]  With 1989 jurors in the qualified list,[8] and 31.1% black 18+ citizens in the community, the expected mean is 610 black prospective jurors in the qualified list, with a standard deviation of 20.6 black prospective jurors.  However, there were only 383 black prospective jurors actually contained in the March 2017 Qualified List: 236 black jurors fewer than the expected number.  This is 11 standard deviations below the expected number of black jurors included in the EDLA Qualified List.  The 12 standard deviations observed in *Castaneda* led the Court to conclude that the disparity was so substantial as to establish a prima facie case not just of underrepresentation but of intentional discrimination in excluding Mexican Americans.  It is statistically impossible that the underrepresentation of black prospective jurors in the March 2017 Qualified List was produced by random chance – instead, it is clearly a non-random, systematic effect of the EDLA jury selection method that is related to race.[9]

## IV.   Jury Pools

17) Jury pools drawn in the EDLA in the last seven years have substantially and consistently under-represented black citizens and overrepresented white jurors instead.  As discussed above, the chance of the underrepresentation in Mr. Age Jr.'s case being produced by random chance is negligible.  When that underrepresentation occurs time and time again over a course of years, it is clearly not the luck of the draw but rather a systematic disproportion.

18) In Schedule II-23, the jury administrator produced a list of every jury pool drawn from

---

[7] Binomial distribution calculates the statistical probability that the disparity between a group's jury-eligible population and the group's percentage in the qualified jury pool is attributable to random chance.  *Castaneda*, 430 U.S. at 496 n.17; *Berghuis*, 559 U.S. at 324 n.1.  The binomial probability distribution also allows the calculation of the number of standard deviations an observed number of jurors of a particular group is from that which was expected.

[8] Excluding the three for whom race was unknown.

[9] Using binomial probability distribution, as the Court did in *Castaneda*, the likelihood of drawing not more than 283 black prospective jurors out of the 1,989 drawn to form the qualified list is less than 1 in $10^{30}$.  That is even less probable than the 1 in $10^{25}$ calculated in *Castaneda* (this is so even though *Castaneda* involved one more standard deviation because the size of the sample is so much larger than in *Castaneda*, making it even less likely that the observed percentage of black jurors will diverge so greatly from the expected percentage of black jurors).

the 2013 Master Wheel and from the 2017 Master Wheel (up to May 2020).  This represents 131 petit and grand jury pools totaling 45,567 jurors drawn between September 2013 and May 2020.

19) At 31.1% black representation in the jury eligible population, the expected number of black prospective jurors is 14,171 but the black prospective jurors actually present in the seven years of jury pools was only 9,468 (20.8%).  This is an absolute disparity of 10.3% and a relative disparity of 33.2%.  The distribution of expected and actual jury pool members by race in the seven year period is shown in the table below:

|  | Expected Percentage | Expected Jurors | Actual Percentage | Actual Jurors | Juror Disparity |
|---|---|---|---|---|---|
| Black | 31.1% | 14,171 | 20.8% | 9,468 | -4,703 |
| White | 64.2% | 29,254 | 73.4% | 33,444 | +4,190 |
| All Others | 4.7% | 2,142 | 5.8% | 2,655 | 513 |

**Table 6: Disparity from Expected Number of Black Jurors in EDLA Jury Pools 2013-2020**

20) Once again, the statistical significance of this underrepresentation can be analyzed using binomial distribution.  With 45,567 prospective jurors, 31.1% black prospective jurors and 68.9% not-black prospective jurors, the expected number of black prospective jurors is 14,171, with a standard deviation of 99 jurors.  The black prospective jurors actually present in the seven years of jury pools numbered only 9,468, this is 4,703 black prospective jurors fewer (33%) than the expected number.  The observed number of black prospective jurors is 47.5 standard deviations fewer than expected if the EDLA jury pools fairly represented the racial demographics of 18+ citizens in the community.  This disparity is far more significant than the 12 standard deviations observed in *Castaneda* that led the Court to conclude that the disparity was so substantial as to establish a prima facie case not just of underrepresentation but of intentional discrimination in excluding Mexican Americans.  It is statistically impossible that the underrepresentation of black prospective jurors in the EDLA jury pools from 2013-2020 was produced by random chance – instead, it is clearly a non-random, systematic effect of the EDLA jury selection method that is

related to race.

21) Just as black prospective jurors were underrepresented, white prospective jurors were overrepresented.  With 45,567 prospective jurors and 64.2% white prospective jurors in the community, the expected number of white prospective jurors is 29,254. The white prospective jurors actually present in the seven years of jury pools numbered 33,444, this is 4,190 more white prospective jurors than the expected number.  Thus, there were 4,703 fewer black prospective jurors <u>and</u> 4,190 more white prospective jurors in the jury pools of the EDLA in the last seven years – a racial turnaround of 8,893 prospective jurors.

22) The underrepresentation of black jurors can also be looked at on a pool-by-pool basis.

23) By contrast with the population representation of 31.1%, the average black juror representation in each of the 131 jury pools was only 20.7%.  This is a -10.4% absolute disparity and a -33.4% relative disparity.  The median black juror representation is 20.2% and the standard deviation is 3%.

24) The number of jury pools for each observed percentage[10] of black jurors can be placed in a table as follows:

---

[10] Rounded to the nearest whole percentage figure.

| Percentage of Black Jurors | Number of Jury Pools 2013-2020 |
|---|---|
| 14 | 2 |
| 15 | 5 |
| 16 | 0 |
| 17 | 6 |
| 18 | 14 |
| 19 | 17 |
| 20 | 27 |
| 21 | 13 |
| 22 | 11 |
| 23 | 15 |
| 24 | 4 |
| 25 | 7 |
| 26 | 4 |
| 27 | 2 |
| 28 | 3 |
| 29 | 1 |
| | **131** |

**Table 7: Distribution of Black Representation in EDLA Jury Pools 2013-2017**

25) Similarly, the number of jury pools for each observed percentage of black jurors can be totaled and displayed in a chart and can be seen to be, broadly speaking, normally distributed around its mean of 20.7% black jurors per jury pool.



**Figure 2: Distribution of EDLA Jury Pools 2013-2020 by Black Representation**

26) A normal distribution curve can be created for the observed distribution of 131 jury

pools, with a mean of 20.7% black jurors and a standard deviation of 3.0.  This observed normal curve can be compared with the expected normal curve, if the jury pools reflected the district population's black membership of 31.1% and maintained the observed standard deviation of 3.0.



**Figure 3: Actual v. Expected Normal Distribution for EDLA Jury Pools 2013-2020**

27) Visualizing the information in another way, one can map what a normal distribution of jury pools measured by black representation should look like for the population of EDLA against the actual distribution of jury pools in EDLA 2013-2020 and see how far below the reasonably expected levels of black representation the method of jury selection in the EDLA has fallen.



**Figure 4: Actual v. Expected Distribution of EDLA Jury Pools 2013-2020**

28) This visual comparison shows the dramatic, systematic under-representation of black jurors in the EDLA jury pools for the last seven years. It can be clearly seen that the distribution of actual jury pools consistently and predictably falls far below that which is expected from the population and is, largely outside even the lowest and least probable reaches of the expected normal distribution. Indeed, two thirds of all actual jury pools have had a percentage of black jurors less than 22.1%, the figure that represents three standard deviations below that which would be expected based upon the population of the district.

29) For even one jury pool in EDLA to have only 22% black representation would be more than three standard deviations below the expected mean and be expected in less than 1 in 1,000 randomly selected jury pools. When this underrepresentation happens time and time again, producing an underrepresentation of more than 4,000 prospective black jurors and overrepresentation of more than 4,000 white jurors in the jury pools for the last seven years, the probability that this is not a systematic cause related to race is, as the *Castenada* calculation demonstrated, beyond the realms of possibility. However, because of the systematic exclusion of

black jurors from the qualified list, what should be a statistical impossibility is actually the most likely thing to happen in the EDLA and has been for at least the last seven years.

30) Put another way, if jury pools were normally distributed around an average black percentage in line with the population, you would expect that 57% percent[11] of all jury pools would have a black percentage of equal to 31% or higher.  Instead, because of systematic under-representation of black citizens in the EDLA jury pool, zero jury pools (0.0%) had a black percentage of 31.1% or higher.

31) In seven years and 131 jury pools, the EDLA jury selection system has never once managed to generate a jury pool with even the average number of black jurors expected based upon the population and has instead, on every single occasion overrepresented white jurors and underrepresented black jurors.

## V.     Jury panels

32) From each jury pool is produced a specific jury panel for the selection of a particular petit or grand jury.  That is, a sub-group of jurors from the jury pool is selected to attend court, from which is selected the ultimate grand or petit jury.

33) Counsel does not presently have access to each of the jury panels created from the 131 jury pools.

34) As to the jury panel from which Mr. Age Jr.'s grand jury was selected, Schedule I.6 reports the group from the jury pool summonsed to be on the jury panel to have included 100 prospective jurors, 75 of whom were white and 22 of whom were black.  Schedule I.7 reports the actual jury panel to have included 67 prospective jurors, 16 of whom were black.  So, there was a

---

[11] This figure is higher than 50% because it includes all jury pools with 31% black representation, not simply those above 31%.  12.8% of jury pools would be expected to have 31% black representation (rounding to integers).

significant underrepresentation of black jurors on the panel from which Mr. Age's grand jury was selected, but as the caselaw emphasizes, reliance upon a sample of one is not the proper mode of analysis under the constitution or the statute.  Analysis of more panels, if necessary, must await the provision of additional data.

## VI.    Effect on actual grand jury composition

35) From each jury panel is selected an actual petit or grand jury.

36) Counsel does not currently have access to each of the petit or grand juries actually empaneled from the 2013 and 2017 Master Wheels.

37) Notably, the Supreme Court and the Fifth Circuit Court of Appeals have made it clear that the fair-cross section guarantee does not apply directly to the actual petit or grand jury, but rather to the wheels, lists, pools and panels from which the specific juries are drawn.

38) Nevertheless, some courts have sought to analyze the effect of racial underrepresentation by considering the expected effect on the makeup of an actual jury.

39) This is of questionable value as:

  a.  it assumes that no other racially disparate effects are seen in between drawing the jury pool and selecting the actual jury;

  b.  it imports potentially significant rounding errors when reducing meaningful statistics drawn from large numbers and applies them, without appropriate modification, to small numbers;

  c.  it ignores the amplification of underrepresentation caused by the progressive sampling from a skewed pool;

  d.  it ignores the effect of reducing the absolute number of minority jurors and thus increasing the impact of otherwise relatively small numbers of additional

exclusions downstream in the selection process.

40) Nevertheless, because some courts have found it a useful illustrative tool, the following broad numbers can be drawn from the observed jury selection data:

a. Based on population statistics in the EDLA, a grand jury of 23 would be expected, on average, to contain 15 white grand jurors and 7 black grand jurors.

b. Applying the proportion of black and white prospective jurors actually observed in each of the 131 pools, if those proportions were applied to a grand jury of 23, there would be, on average, 17 white grand jurors and 5 black grand jurors.  Two things immediately flow from this:

   i. First, an all-white quorum of the grand jury can now be created, federal grand juries requiring a quorum of 16; and,

   ii. Second, there would be 12 more white than black grand jurors, rather than 8 more, an increase in racial disparity of 4 grand jurors.  This is because an underrepresentation of black jurors does not simply remove a black juror, but replaces that black juror with a white juror.

c. Moreover, more than a third of the 131 jury pools would have resulted in a grand jury with four or more times as many white grand jurors as black grand jurors, when the average disparity should be about twice as many.  Only 2 out of 131 of these hypothetical grand juries would have limited the racial disparity to twice as many white grand jurors as black grand jurors, the ratio anticipated by the population statistics.

41) Again, noting the caveats that must accompany this style of analysis, it can be seen that the EDLA jury selection method results in significant and meaningful underrepresentation of black

potential jurors and significant and meaningful white dominance of jury pools in the district.

## VII.   EDLA Lists compared to the other 93 districts in the United States

42) All federal districts are required to prepare and maintain demographic statistics identifying the racial makeup of their wheels and lists and comparing those figures to the demographic make-up of the 18+ population in their district.  This data is produced in AO-12 forms.[12]

43) AO-12 forms for current jury wheels and lists are not publicly available, however, AO-12 forms for the most recently emptied Master Wheels are "available for public inspection for the purpose of determining the validity of the selection of any jury."  See 28 U.S.C.S. § 1868.

44) I have supervised my staff in a process of requesting copies of these AO-12s from every federal district in the United States and its territories.

45) The process of obtaining AO-12s from all of the districts is ongoing as several districts have failed to respond or continue to work on complying with the requests.  We are on our third round of requests and follow-up in what has been a laborious process.

46) At the date of writing, including the March 2017 AO-12 from EDLA, we have obtained 247 AO-12 forms from 106 divisions, across 40 of the country's 94 judicial districts.[13]  3 judicial districts have refused to provide the data, on the theory that the law does not require disclosure. 14 districts have indicated that a response is being prepared and 37 districts have not responded at all.

47) Using this dataset of almost half of the districts in the country for which we have data,

---

[12] Originally the Judicial Conference required all jurisdictions to submit their AO-12s (previously known as JS-12s) to the Administrative Offices of the United States Courts.  In 1982, the Judicial Conference voted to decentralize and relieve the local courts of this responsibility.

[13] Many districts are divided into different jury divisions, each of which must produce its own AO-12.  Our request asked for all available AO-12s from the retired Master Wheel and a number of districts provided multiple AO-12s covering different time periods.

we can compare the representativeness of jury wheels and lists in other districts with those in the Eastern District of Louisiana.

48) In the Appendix I we have listed the districts and the pertinent details of their AO-12s, in particular, the percentage of black jurors in the wheel or list and the percentage of black prospective jurors in the community.  From this data, the absolute and relative disparities in black representation can be quickly derived.[14]  The actual AO-12s relied upon are attached as Appendix II.[15]

49) A review of the available AO-12s from across the country reveals that the underrepresentation of black jurors in the EDLA is by far the worst in the country.  No other district in the country, for which data is available, has produced an absolute disparity figure in double digits and the overwhelming majority of districts do not begin to approach the EDLA's level of underrepresentation of black prospective jurors.  The EDLA's status as an extreme outlier is true whether looking at districts with a smaller black population or those with a sizable black population, like the EDLA.

50) The EDLA is one of 13 jury divisions in the dataset with a black community population of 20% or more.  Within that group with a sizable black population, the AO-12s show that EDLA has easily the largest absolute and relative disparities – that is, the largest underrepresentation of black citizens in its jury wheels.  EDLA has an absolute disparity of -11.84%.  By comparison, the average absolute disparity for the other 12 jurisdictions with 20%+ black community

---

[14] In some cases, the AO-12 reflects raw numbers not percentages and the relevant calculations were performed.  Seven AO-12s did not provide demographic data for the community and this figure was approximated, as described in Appendix I.  While the calculations for these seven AO-12s are therefore approximations, they are included because they do not impact any of the conclusions drawn from the data in this declaration.  Precise demographic figures will be sought and supplemented when available.

[15] Four districts requested or demanded that the actual AO-12s provided not be disseminated outside of the undersigned's office and so those AO-12s are not attached but the relevant data gleaned from the AO-12s is accurately reflected in the table in Appendix I.  Counsel will seek the necessary judicial authorization to make these AO-12s available and supplement accordingly.

representation is -4.7%.[16] EDLA has a relative disparity of -38%.  The average relative disparity

for the other 12 jurisdictions with 20%+ black community representation is -16%.

51) The absolute disparity displayed in the 247 AO-12s obtained can be shown on a scatter

chart, listing the absolute disparity for each district and division in alphabetical order.   The

resulting chart (with district names omitted to avoid clutter) shows that EDLA is an outlier, with

by far the greatest absolute disparity in black juror representation in the country:



**Figure 5: Absolute Disparity in Black Representation by Jurisdiction Nationwide**

52) The same data can be plotted in order of absolute disparity from those districts that

over represent black jurors, through the majority of districts with an absolute disparity around 2%

down to the EDLA, with the greatest level of underrepresentation of black jurors at 11.8%:

---

[16] Some jurisdictions provided more than one AO-12, so to avoid skewing the average only the most recent AO-12 provided from each of the other jurisdictions was used and compared with the March 2017 EDLA AO-12.



**Figure 6: Absolute Disparity in Black Representation by Extent of Underrepresentation Nationwide**

53) In short, the data shows that EDLA has the worst record of under-representing black jury participation across all jurisdictions in the country, including in the group of jurisdictions with a similarly sizable black population.

## VIII.  Conclusion

54) Consistently and predictably, in every jury pool drawn in EDLA for the last seven years, black jurors have been underrepresented and white jurors over represented.

55) A random system of jury selection will produce jury pools that sometimes have a few more black jurors and sometimes a few less black jurors than would match the precise racial breakdown of the community.

56) However, in EDLA in the last seven years, no jury pool has been assembled that even once matched the average number of black jurors in the community.  Every single time, black jurors have been unrepresented: their expected representation cut down, on average, by a third.

57) If EDLA jury selection were random as to race the chance that even one jury pool would underrepresent black jurors by 10.4% would be negligible.  The fact that this level of underrepresentation, or worse, is the most common outcome of the jury selection method used in

the EDLA clearly proves that the underrepresentation of black jurors is not produced by random chance.

58) The underrepresentation in the qualified list from which Mr. Age Jr.'s grand jury was selected is even worse than average, with an absolute disparity of 11.84% and a relative disparity of 38.1%. These disparities cannot be produced by a random selection method, but only one that is skewed by systematic biases related to race.

59) The racial disparity does not end with the underrepresentation of black jurors but is matched by a similar overrepresentation of white jurors which, once again, cannot be produced by a random method of jury selection in this district. As a result, defendants in EDLA are indicted and tried by juries drawn from jury pools that egregiously under represent black jurors, over represent white jurors and display a white dominance out of proportion to the make-up of the EDLA community.

60) EDLA has the worst underrepresentation of black jurors in any federal district in the country for which data is available.

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Richard Bourke*
January 18, 2021