## UNITED STATES OF AMERICA V. LOUIS AGE JR., 16-32-2

## 28 U.S.C.S. 1867(D) DECLARATION OF JEFFREY MARTIN

The undersigned, Jeffrey Martin, declares as follows:

1. My name is Jeffrey O'Neal Martin. I hold a Bachelor's degree in Mathematics and Economics from Vanderbilt University and a Master's degree in Economics from the University of Chicago.
2. I am employed as a consultant on statistical issues, a consultant on actuarial issues, and as a consultant to political campaigns. I have been qualified as an expert on statistical issues in Federal Courts and State Courts.
3. Since 1997, I have been involved in cases involving challenges to the jury lists in Federal and State Courts. I have worked on over seventy federal cases in over twenty-five federal districts.
4. I have been asked by counsel to review the construction and implementation of the Master Jury Wheel and the Qualified Jury Wheel used to select grand jurors in this case. I have also reviewed the previous Master and Qualified Jury Wheels as well as pools of persons summoned from the current and previous Master Jury Wheels.

SUMMARY OF FINDINGS

5. In the Eastern District of Louisiana, the choice of a process of selecting persons from only the voter registration list with only a follow-up letter leads and has led to an available group of jurors that statistically significantly under-represents Black or African-American persons compared to the jury eligible population. The under-representation is systematic in the sense that it is inherent in the sources and procedures used by the Eastern District of Louisiana.
6. The Qualified Jury Wheel used to summon grand jurors in this case under-represents Black or African-American persons. The under-representation is statistically significant.
7. The Qualified Jury Wheels immediately previous to and after the Qualified Jury Wheel used to summon grand jurors in this case under-represents Black or African-American persons. The under-representation is statistically significant.
8. The under-representation of Black or African-Americans continues through the selection of the grand jury in this case.
9. The 49,866 summonses listed in the group of 136 pools of persons summoned over the eight years from 2013 through 2021 from the Qualified Jury Wheel and the previous Qualified Jury Wheel under-represents Black or African-American persons. The under-representation is statistically significant.

10. Each of the 136 individual pools of persons summoned over the eight years from 2013 through 2021 from the Qualified Jury Wheel and the previous Qualified Jury Wheel under-represent Black or African-American persons.
11. The pool of 100 persons summoned for this case under-represents Black or African-American persons.
12. The panel of 67 persons considered as grand jurors in this case under-represents Black or African-American persons.
13. The 29 persons selected as grand jurors in this case under-represents Black or African-American persons.
14. In the Eastern District of Louisiana, the choice of a process of selecting persons from only the voter registration list with only a follow-up letter leads and has led to an available group of jurors that under-represents persons whose household income is less than $50,000 compared to the jury eligible population.
15. The Qualified Jury Wheel used to summon grand jurors in this case under-represents persons whose household income is less than $50,000. The under-representation is statistically significant.
16. Contrary to the Jury Service and Selection Act and the Jury Plan for the Eastern District of Louisiana, the entire voter registration list was not used to construct the Master Jury Wheel as described in the Jury Plan and Jury Service and Selection Act.
17. Contrary to the Jury Service and Selection Act and the Jury Plan for the Eastern District of Louisiana, the Master Jury Wheel in this case was not constructed in a random manner.
18. The Master Jury Wheel in this case does not proportionately represent parishes in the Eastern District of Louisiana.
19. The Qualified Jury Wheel reflects an over-representation of Jefferson Parish and St. Tammany Parish and an under-representation of Orleans Parish. In particular, White persons in Jefferson Parish and Orleans Parish are over-represented and Black or African-American persons are under-represented in St. Tammany Parish.
20. There are systematic reasons for the under-representation of Black or African-American persons.
21. About one half of the jury eligible population in the Eastern District of Louisiana is included in the process of creating the Qualified Jury Wheel.
22. Less than a third of the Black or African-American jury eligible population is included in the process of creating the Qualified Jury Wheel.
23. There are available measures currently in use in other federal districts to increase the representativeness of the Qualified Jury Wheel in the Eastern District of Louisiana.

JURY ELIGIBLE POPULATION IN THE EASTERN DISTRICT OF LOUISIANA

24. The jury eligible population is defined as the population that is age 18 years and older who are citizens of the United States. While there are other requirements to serve as a

juror besides age and citizenship, this definition is standard for the analysis of jury lists and is the basis for census numbers on the Administrative Office of the U.S. Courts' Form AO-12 ("Report on the Operation of the Jury Selection Plan").

25. The most current United States Census Bureau numbers for the jury eligible population are the American Community Survey 5 Year Average numbers for 2019.
26. Because the Form AO-12 used in this case reflects the American Community Survey 5 Year Average numbers for 2015, this analysis will primarily use the 2015 American Community 5 Year Average numbers.
27. The Administrative Office of Courts distributes American Community Survey 5 Year numbers to the various districts to help complete form AO-12. The choice of the 5 Year numbers is because the 5 Year numbers are produced for every county and parish in the country. The 1 Year numbers are not produced for smaller counties and parishes and so are not distributed by the Administrative Office of the Courts.
28. The 2015 American Community Survey 5 Year Average numbers reflect the years 2015, 2014, 2013, 2012, and 2011. Therefore, there is a lag in how the numbers reflect the 2015 population.
29. The Census Bureau also reports American Community Survey 1 Year numbers for the largest counties or parishes in the country.
30. Only Jefferson Parish and Orleans Parish are large enough for the Census Bureau to report American Community Survey 1 Year numbers for Black or African-American persons.
31. Using the 2015 American Community Survey 5 Year Average numbers, the jury eligible population for the Eastern District of Louisiana in 2015 is 64.20% White, 31.10% Black or African-American, 0.80% American Indian or Alaska Native, 1.70% Asian, 0.00% Native Hawaiian or Pacific Islander, 0.80% of some other race, and 1.40% multi-racial. The jury eligible population is 4.40% Hispanic or Latino. The jury eligible population is 47.50% Male and 52.50% Female.
32. Note that to be consistent with the Form AO-12 dated March 31st, 2017 and the information from the Administrative Office of the Courts, the jury eligible population percentages have been rounded to 1 decimal place and the rest of the analysis is rounded to 2 decimal places.
33. The census numbers more contemporaneous with the 2017 Grand Jury in this case are the 2017 American Community Survey 5 Year Average numbers which reflect a higher percentage of Black or African-American persons of 31.46%. If this analysis had used the higher 2017 numbers the under-representation calculated would be greater than shown.
34. The 2017 American Community Survey 1 Year numbers for Jefferson Parish and Orleans Parish would result in a higher percentage for Black or African-American persons of 31.77% in the Eastern District of Louisiana and greater under-representation for Black or African-American persons.

35. The economic status of persons in the Eastern District of Louisiana can be represented by household income.
36. Household income is not available in any of the supplied data such as the voter registration list or Master Jury Wheel.
37. An income amount can be estimated for each person in the data as the median household income for each person's Zipcode and race. In this analysis, the 2018 median household income by Zipcode and race of householder is used. These income numbers reflect the nearest available numbers on a Zipcode basis and were reflected in the 2018 American Community Survey 5 Year Numbers
38. In the Eastern District of Louisiana, 42.06% of the jury eligible population is in a household with an income of less than $50,000.

STATISTICAL ANALYSIS OF UNDER-REPRESENTATION

39. Three different Form AO-12's were supplied and reflect the demographic data from the Qualified Jury Wheel of the Eastern District of Louisiana from which the grand jurors were selected.
40. These Form AO-12's are consistent with the data files supplied reflecting the Master Jury Wheel last refilled on December 15th, 2016.
41. The Form AO-12 dated March 31st, 2017 is closest in date to the day when persons were drawn for summoning for this grand jury on April 19th, 2017.
42. The Form AO-12 dated March 31st, 2017 reflects that the Qualified Jury Wheel is 76.47% White, 19.26% Black or African-American, 0.40% American Indian or Alaska Native, 1.11% Asian, 0.20% Native Hawaiian or Pacific Islander, 1.31% of some other race, and 1.26% multi-racial.
43. The 49,866 summons listed in the group of 136 pools for the years 2013 through 2021 is 73.94% White, 20.94% Black or African-American, 0.62% American Indian or Alaska Native, 1.37% Asian, 0.23% Native Hawaiian or Pacific Islander, 1.45% of some other race, and 1.45% multi-racial.
44. Individually, the pools range in percentage of Black or African-American persons from 14.07% to 28.81%. The average percentage of Black or African-American persons was 20.89% and the median percentage of Black or African-American persons was 20.41%.
45. The group of 100 persons summoned as potential grand jurors in this case, Pool 101170602, is 75.00% White, 22.00% Black or African-American, 1.00% American Indian or Alaska Native, 0.00% Asian, 0.00% Native Hawaiian or Pacific Islander, 1.00% of some other race, and 1.00% multi-racial.
46. The panel of 67 persons considered as potential grand jurors in this case is 74.63% White, 23.88% Black or African-American, 0.00% American Indian or Alaska Native, 0.00% Asian, 0.00% Native Hawaiian or Pacific Islander, 1.49% of some other race, and 0.00% multi-racial.

47. The group of persons impaneled as grand jurors in this case is 79.31% White, 20.69% Black or African-American, 0.00% American Indian or Alaska Native, 0.00% Asian, 0.00% Native Hawaiian or Pacific Islander, 0.00% of some other race, and 0.00% multi-racial.
48. Note that the group of persons impaneled as grand jurors includes 3 persons who were impaneled but later excused from the grand jury.
49. Using the supplied data files and estimation of household income, 30.26% of the Qualified Jury Wheel has a household income that is less than $50,000.
50. 64.37% of persons with an estimation of household income of less than $50,000 are Black or African-American persons.  3.22% of persons with an estimation of household income of more than $50,000 are Black or African American persons.  The grouping of household income is closely related to the percentage of Black or African-American persons.
51. There are several standard statistical analyses used to analyze the under-representation of a distinctive group.  The most common and easiest to calculate are Absolute Disparity and Comparative Disparity.  From a scientific perspective, the number of Standard Deviations from Expected shows whether the under-representation of a group is systematic or merely the result of "luck of the draw."

ABSOLUTE DISPARITY

52. Absolute Disparity is simply the arithmetic difference between the percentage of a distinctive group on the jury list and the percentage of the same distinctive group in the population.
53. The Absolute Disparity for Black or African-American persons on the Qualified Jury Wheel is 11.84% under-representation (31.10% minus 19.26%).
54. The Absolute Disparity for Black or African-American persons in the summons for the group of 136 pools for the years 2013 to 2021 is 10.16% under-representation (31.10% minus 20.94%).
55. The Absolute Disparity for Black or African-American persons in each of the 136 individual pools showed under-representation.  The Absolute Disparity for Black or African-American persons in each individual pool ranged from 2.29% to 17.03% under-representation.
56. In 135 of the 136 pools, the Absolute Disparity shows over-representation of White persons.
57. The Absolute Disparity for Black or African-American persons in the group of 100 persons summoned for this grand jury is 9.10% under-representation (31.10% minus 22.00%).
58. The Absolute Disparity for Black or African-American persons in the panel of 67 persons considered for this grand jury is 7.22% under-representation (31.10% minus 23.88%).
59. The Absolute Disparity for Black or African-American persons impaneled for the grand jury in this case is 10.41% under-representation (31.10% minus 20.69%).

60. The Absolute Disparity for persons on the Qualified Jury Wheel with less than $50,000 household income is 11.80% under-representation (42.06% minus 30.26%).

COMPARATIVE DISPARITY

61. Comparative Disparity by formula is the Absolute Disparity for a cognizable group divided by the population percentage of that cognizable group. Note that, mathematically, since the population percentage of a cognizable group can never be greater than 100% or 1.00, Comparative Disparity which is divided by something less than or equal to 1.00, will always be greater than Absolute Disparity.
62. Unlike Absolute Disparity, Comparative Disparity is mathematically a rate. That is, Comparative Disparity shows the rate at which a cognizable group is represented. In this way, Comparative Disparity means the same thing for a larger group that it does for a smaller group. A 50% Comparative Disparity means that half of the cognizable group expected is excluded whether that group is a larger part of the population such as White persons (64.20%) or a smaller part of the population such as Black or African-American persons (31.10%).
63. The Comparative Disparity for Black or African-American persons on the Qualified Jury Wheel is 38.07% under-representation (11.84% divided by 31.10%).
64. That is, over a third of the Black or African-American persons expected to be on the Qualified Jury Wheel are missing.
65. The Comparative Disparity for Black or African-American persons in the summons for the group of 136 pools for the years 2013 to 2021 is 32.67% under-representation (10.16% divided by 31.10%).
66. The Comparative Disparity for Black or African-American persons in each of the 136 individual pools showed under-represenation. The Comparative Disparity for Black or African-American persons ranged from 7.35% to 54.76% under-representation.
67. The Comparative Disparity for Black or African-American persons in the group of 100 persons summoned for the grand jury is 29.26% under-representation (9.10% divided by 31.10%).
68. The Comparative Disparity for Black or African-American persons in the panel of 67 persons considered for the grand jury is 23.22% under-representation (7.22% divided by 31.10%).
69. The Comparative Disparity for Black or African-American persons impaneled as grand jurors is 33.47% under-representation (10.41% divided by 31.10%).
70. The Comparative Disparity for persons on the Qualified Jury Wheel with less than $50,000 household income is 28.06% under-representation (11.80% divided by 42.06%).

STANDARD DEVIATIONS FROM EXPECTED

71. Standard Deviation analysis is a widely accepted and fundamental tool used by statisticians to analyze data. Standard Deviation analysis allows statisticians to determine if the under-representation of a distinctive group is statistically significant or not. That is, in any group drawn from the population such as a jury list, there are random factors that mean that the demographics of the jury list drawn from the population will not match the population demographics exactly because of "luck of the draw." However, standard deviations allow statisticians to scientifically determine whether the demographics of the jury list diverge substantially enough from the population demographics that the difference is not the product of chance but is systematic. Statisticians use a standard of 2 or 3 standard deviations to determine statistical significance. If there is no systematic under or over-representation of a distinctive group, the divergence of demographics should exceed 2 standard deviations only approximately 5% of the time while the divergence of demographics should exceed 3 standard deviations only approximately 0.5% of the time. In the same way that the decrease in probability from 2 standard deviations to 3 standard deviations from expected is much greater than 1.5 times (or 3/2 times), higher standard deviations from expected exponentially reduce the probability. The probability of more than 5 standard deviations from expected is practically 0.00%.

72. Note that standard deviations take into account the size of the sample. Form AO-12 reflects a smaller group of persons than the data file supplied which reflects the end of the life of the Qualified Jury Wheel. The percentages from the data files will therefore be more reliable statistically.

73. The percent of Black or African-American persons on the Qualified Jury Wheel differs from the percent of Black or African-American persons in the population by 11 standard deviations. In other words, the under-representation of Black or African-American persons on the Qualified Jury Wheel is not the result of random factors, chance, or luck, but is the result of a systematic process that under-represents Black or African-American persons.

74. The percent of Black or African-American persons on the Qualified Jury Wheel data file differs from the percent of Black or African-American persons in the population by 24 standard deviations. The reason the standard deviations from expected is greater using the Qualified Jury Wheel data file than from the March 2017 Form AO-12, as above, is that the data file includes newly qualified persons after the completion of that Form AO-12. The larger number of jurors in the data file makes it even less likely that the underrepresentation could appear by random chance.

75. The percent of Black or African-American persons in the 49,866 summonses listed in the group of 136 pools for the years 2013 to 2021 differs from the percent of Black or African-American persons in the population by 48 standard deviations. In other words, the under-representation of Black or African-American persons in the 136 pools is not the result of random factors, chance, or luck, but is the result of a systematic process that under-represents Black or African-American persons.

76. The percent of persons on the Qualified Jury Wheel with less than $50,000 household income differs from the percent of Black or African-American persons in the population by 29 standard deviations. In other words, the under-representation of Black or African-American persons on the Qualified Jury Wheel is not the result of random factors, chance, or luck, but is the result of a systematic process that under-represents Black or African-American persons.

## HISTORICAL UNDER-REPRESENTATION

77. Besides the data for the 2017 Master Jury Wheel, I was supplied data files reflecting the refilling of the 2013 Master Jury Wheel, the 2015 supplement of the 2013 Master Jury Wheel, and the 2019 Master Jury Wheel supplement of the 2017 Master Jury Wheel.
78. The Qualified Jury Wheel resulting from the refilling of the 2013 Master Jury Wheel is 73.13% White and 22.09% Black or African-American.
79. The Qualified Jury Wheel resulting from the 2015 Supplement to the 2013 Master Jury Wheel is 74.94% White and 20.10% Black or African-American.
80. The Qualified Jury Wheel resulting from the refilling of the 2017 Master Jury Wheel is 72.58% White and 22.18% Black or African-American.
81. The Qualified Jury Wheel resulting from the 2019 Supplement to the 2017 Master Jury Wheel is 71.74% White and 22.56% Black or African-American.
82. The percentage of Black or African-American person of the jury eligible population from the American Community Survey 5 Year Average numbers for 2013, 2015, 2017, and 2019 are 30.73%, 31.06%, 31.10%, and 31.83% respectively.
83. The Absolute Disparity of the Qualified Wheel shows 8.64% under-representation of Black or African-American persons in the 2013 refilling, 10.96% under-representation in the 2015 supplementation, 8.92% under-representation in the 2017 refilling, and 9.27% under-representation in the 2019 supplementation.
84. The Qualified Jury Wheel resulting from the 2013 Qualified Jury Wheel refilling is comprised of 30.64% of persons with a household income of less than $50,000.
85. The Qualified Jury Wheel resulting from the 2015 Supplement to the 2013 Qualified Jury Wheel is comprised of 29.18% of persons with a household income of less than $50,000.
86. The Qualified Jury Wheel resulting from the 2017 Qualified Jury Wheel refilling is comprised of 30.26% of persons with a household income of less than $50,000.
87. The Qualified Jury Wheel resulting from the 2019 Supplement to the 2017 Qualified Jury Wheel is comprised of 31.49% of persons with a household income of less than $50,000.
88. The Absolute Disparity of the Qualified Wheel shows 11.42% under-representation of persons with a household income of less than $50,000 in the 2013 refilling, 12.88% under-representation in the 2015 supplementation, 11.80% under-representation in the 2017 refilling, and 10.57% under-representation in the 2019 supplementation.

## THE 136 POOLS FROM THE EIGHT YEARS OF 2013 THROUGH 2021

89. The 136 pools from the eight years of 2013 through 2021 produced summonses for 10,313 Black or African-American persons and 36,413 White persons.
90. Had those 136 pools produced the same percentage of Black or African-American persons as represented in the jury eligible population, the pools would have produced 15,316 Black or African-American summonses. Likewise, had the 136 pools produced an expected number of White summonses, the pools would have produced 31,617 White summonses.
91. That is, there were 5,003 less Black or African-American summonses and 4,795 more White summonses than expected from the jury eligible population or a net turnaround of 9,798 summonses.

## REGISTERED VOTERS EXCLUDED FROM THE MASTER JURY WHEEL

92. The Jury Service and Selection Act describes that the source of names for Master Jury Wheels should include either registered voters or actual voters and then possibly the supplementation of names from other lists.
93. The Jury Plan of the Eastern District of Louisiana specifies that the lists of registered voters will be used to construct the Divisional Master Jury Wheels.
94. The entire list of registered voters is not used to create the Master Jury Wheels in this case as opposed to what is described in the Jury Plan.
95. The Louisiana Secretary of State posts historical summaries of the voter registration lists for various dates including November 8th, 2016. The timeline for the construction of the Master Jury Wheel lists November 7th, 2016 as the date the voter registration file was requested and November 9th, 2016 as the date the voter registration file was received. The general election occurred on November 8th, 2016.
96. The Louisiana Secretary of State states that as of November 8th, 2016 there were 1,081,738 registered voters in the Eastern District of Louisiana.
97. The voter registration list used to construct the Master Jury Wheel included 1,035,802 registered voters.
98. There were 45,936 voters excluded from the Eastern District of Louisiana registered voters' list used to construct the Master Jury Wheel.
99. These excluded voters make up 4.25% of the Eastern District of Louisiana registered voters' list.
100. The excluded voters were not supplied in the data produced for this case and so I am not able to analyze these voters.

## THE MASTER JURY WHEEL WAS NOT CONSTRUCTED IN A RANDOM MANNER

101. The Master Jury Wheel in this case was constructed by selecting persons from the supplied voter registration list.
102. The Jury Plan states that the minimum number of persons to create the Master Jury Wheel is one-half of one percent of the total number of names on voter registration lists. The supplied voter registration list includes 1,035,802 voters and thus would require a minimum of 5,180 persons for the Master Jury Wheel.
103. 60,000 persons, which exceeds the minimum of 5,180 persons, were chosen to actually create the Master Jury Wheel. 60,000 is a round number that is easy to choose and communicate. However, given the process used by the Eastern District of Louisiana, the number cannot be evenly divided into the number of registered voters and causes the construction of the Master Jury Wheel to not be randomly selected as described below.
104. Persons were selected by choosing the first person at a randomly determined starting number and then selecting persons at a constant interval. In creating the 2017 Master Jury Wheel, the starting number was 210,019, and then every 18th person was selected.
105. If this process had returned a randomly selected group, then the proportion selected from each parish would mirror the proportion of each parish in the supplied voter registration list.
106. However, the process resulted in every 18th person being selected in every parish except for Jefferson Parish. In Jefferson Parish a little more than every 15th person was selected.
107. The cause of the non-randomness in the process was that the voter registration list is sorted by the parish. That is, the voter registration list starts with 14,993 persons from Assumption Parish followed by 264,115 persons from Jefferson Parish, and so on.
108. By starting at name 210,019 on the voter registration list, and selecting every 18th person, one is not able to select the full 60,000 persons required to be selected in one pass of the supplied voter registration list. As a result, the process must continue to pass the original starting person and select an additional 2,456 persons. Because the starting person was in the portion of the supplied voter registration list that reflected Jefferson Parish persons, all of the 2,456 additional persons were selected from Jefferson Parish.
109. If 60,930 persons were chosen as the size of the Master Jury Wheel instead of 60,000 persons, then the process could have selected every 17th person and would have only passed through the supplied voter registration list once and thus yielded a random selection.
110. Randomness of the selection of persons for the Master Jury Wheel could have been achieved by either selecting a number of persons which would evenly divide into the voter registration list, by randomly sorting the voter registration list, or by using another simple random selection process.

THE MASTER JURY WHEEL IS NOT PROPORTIONAL TO THE PARISHES

111. The non-randomness of the selection of the Master Jury Wheel leads to the over-representation of Jefferson Parish.
112. An extra 2,456 or 4.09% of the Master Jury Wheel is placed in Jefferson Parish at the expense of all other parishes.
113. The proportion of Jefferson Parish in the Master Jury Wheel is 28.55% compared to 25.50% in the supplied voter registration list. All the other parishes are a lower percentage of the Master Jury Wheel than the parishes are in the voter registration list.
114. The calculation of the Comparative Disparity between the voter registration list and the Master Jury Wheel for parishes shows that Jefferson Parish is over-represented with a Comparative Disparity of 11.96%. The Comparative Disparity for all the other parishes shows an under-representation of 4.05% to 4.13%.

THE QUALIFIED JURY WHEEL OVER-REPRESENTS JEFFERSON PARISH AND ST. TAMMANY PARISH AND UNDER-REPRESENTS ORLEANS PARISH

115. The non-random process of selecting persons for the Master Jury Wheel and the process of qualifying persons for the Qualified Jury Wheel causes the Qualified Jury Wheel to not proportionately reflect the parishes.
116. The largest under-representation of the parishes is Orleans Parish with a reduction in proportions of 4.05%. The largest over-representation of the parishes is St. Tammany Parish with an increase in proportions of 3.39% and Jefferson Parish with an increase in proportions of 2.29%.
117. White persons in Jefferson Parish make up 17.45% of the entire jury population in the Eastern District of Louisiana. White persons in Jefferson Parish make up 20.96% of the Qualified Jury Wheel.
118. White persons in St. Tammany Parish make up 12.64% of the entire jury population in the Eastern District of Louisiana. White persons in St. Tammany Parish make up 15.68% of the Qualified Jury Wheel.
119. Black or African-American persons in Orleans Parish make up 13.89% of the entire jury population in the Eastern District of Louisiana. Black or African-American persons in Orleans Parish make up 8.75% of the Qualified Jury Wheel.

EXCLUDED 18, 19, AND 20-YEAR-OLDS

120. The Master Jury Wheel is refilled every 4 years and supplemented 2 years after the refilling. At the end of the use of the Master Jury Wheel, those selected from the refilling will be at least age 21 and those from the supplement will be at least age 19.

PERSONS MOVING IN THE EASTERN DISTRICT OF LOUISIANA

121. 12.55% of the jury eligible population in the Eastern District of Louisiana (using the Census Bureau's 2015 American Community Survey 5 Year Average PUMS data) has moved in the last year. Because the Master Jury Wheel is refilled every four years and supplemented two years after the refilling, there are persons on the Qualified Jury Wheel whose data is up to four years old.

SYSTEMATIC FACTORS OF UNDER-REPRESENTATION

122. The Qualified Jury Wheel that was created under-represents Black or African-American persons.
123. There are several choices and procedures which lead to the under-representation of Black or African-American persons. Some of the choices and procedures overlap, exacerbate, or counteract each other in terms of the under-representation.
124. The choice to use the voter registration list as the sole source of names increased the representation of Black or African-American persons by 0.45%.
125. The non-random selection of persons from the supplied voter registration list for the construction of the Master Jury Wheel decreased the representation of Black or African-American persons by 0.29%.
126. The mailing of qualification questionnaires is done from a random selection from the Master Jury Wheel. However, the selection of persons to receive a qualification questionnaire increased the representation of Black or African-American persons by 0.03%.
127. Some of the qualification questionnaires that are mailed are returned as undeliverable by the United States Post Office. The exclusion of persons whose qualification form was undeliverable decreased the representation of Black or African-American persons by 1.63%.
128. Some of the qualification questionnaires that are mailed are not returned by the post office and a response is not received by the Court. It is not known whether these latter qualification questionnaires were successfully delivered and received or not. The exclusion of persons whose qualification form did not produce a response decreased the representation of Black or African-Americans by 8.73%.
129. It is not always clear whether a particular qualification questionnaire marked undeliverable by the post office was truly undeliverable.
130. There are many categories that the United States Postal Service tracks for undeliverable mail. These categories include Change of Address, Box Closed - No Order, Moved left no Address, Temporary COA, Attempted not Known, In Dispute, Insufficient Address, Illegible, No Mail Receptacle, No such Number, Deceased, Not Deliverable as Addressed/Unable to Forward/Forwarding order expired, Refused, No such Street, Unclaimed, and Vacant.
131. The latest statistics published by the United States Postal Service titled "Undeliverable-as-Addressed (UAA) Statistics by Mailing Industry Quarterly Report (Q1 FY21)" shows

that for governmental mail, Temporary COA (4.49%), In Dispute (0.06%), Insufficient Address (4.37%), Illegible (0.06%), No Mail Receptacle (3.71%), No such Number (2.60%), Refused (0.87%), No such Street (0.84%), and Unclaimed (2.63%) alone add up to 19.62% of undeliverable mail.  These categories do not necessarily reflect the eligibility of persons to serve on a jury or whether an address is proper.
132. It is my experience that apartment dwellers whose apartment number is not included, misprinted, or misformatted sometimes do not receive their mail.
133.  For these reasons, it is difficult to determine which qualification forms were received by the intended person.  If the qualification form is not received then there will be no response.
134. The Eastern District of Louisiana sends a follow-up letter though there is no set schedule for the follow-up and there is a minimum of six months delay in sending the follow-up.
135. The Eastern District of Louisiana does not replace a qualification questionnaire that is not responded to with another qualification questionnaire from the same Zip code.
136. From the returned qualification forms, some persons are disqualified for statutory reasons.  The qualification process decreases Black or African-American representation by 0.87%.
137. From the returned qualification forms, some persons are exempted from jury service.  The exemptions decrease Black or African-American representation by 0.02%.
138. Some persons receive an excuse from the Court from jury service.  The excusals increase Black or African-American representation by 2.14%.
139. The same factors occur with economic status as grouped by whether household income is less than $50,000.
140. The choice to use the voter registration list as the sole source of names decreased the representation of persons with less than $50,000 household income by 0.68%.
141. The non-random selection of persons from the supplied voter registration list for the construction of the Master Jury Wheel decreased the representation of persons with less than $50,000 household income by 0.89%.
142. The mailing of qualification questionnaires is done from a random selection from the Master Jury Wheel.  However, the selection of persons to receive a qualification questionnaire increased the representation of persons with less than $50,000 household income by 0.05%.
143. Some of the qualification questionnaires that are mailed are returned as undeliverable by the United States Post Office.  The exclusion of persons whose qualification form was undeliverable decreased the persons with less than $50,000 household income by 1.51%.
144. Some of the qualification questionnaires that are mailed are not returned by the post office and a response is not received by the Court.  The exclusion of persons whose qualification form did not produce a response decreased the representation of persons with less than $50,000 household income by 8.21%.

145. From the returned qualification forms, some persons are disqualified for statutory reasons. The qualification process decreases the representation of persons with less than $50,000 household income by 1.40%.
146. From the returned qualification forms, some persons are exempted from jury service. The exemptions decrease the representation of persons with less than $50,000 household income by 0.01%.
147. Some persons receive an excuse from the Court from jury service. The excusals increase the representation of persons with less than $50,000 household income by 0.85%.

INCLUSIVENESS OF THE QUALIFIED JURY WHEEL

148. The choice of using the voter registration list as the sole source of jurors excludes 14.45% of the 2015 jury eligible population who has not registered to vote. Because the jury eligible population has been growing, using a more contemporaneous jury eligible population from 2016 would raise the percent excluded.
149. The 85.55% inclusiveness of the supplied voter registration list barely meets the National Center for State Courts Trial Court Performance Standards and Measurement's recommended threshold for an inclusive list of 85%. If the supplied voter registration list was compared to the 2016 jury eligible population, the supplied voter registration list would not meet the recommendation.
150. Of the qualification forms mailed, 11.89% were returned as undeliverable and for 32.12% a response was not received by the Court.
151. Since the selection of persons to receive a qualification form is essentially a random draw from the Master Jury Wheel, the rates of non-registered voters, undeliverable qualification forms, and responses not received by the Court can be combined.
152. The rate of inclusion in the process used by the Eastern District of Louisiana results in an inclusion rate of 47.90% ((100% less 14.45%) times (100% less 11.89% less 32.12%)).
153. 52.10% or a little more than a half of the jury eligible population would be excluded from the possibility of selection as jurors.
154. The rate of inclusion for Black or African-American persons is 31.80% (whose voting registration rate is 84.91%, undeliverable rate is 16.47%, and response not received by the Court rate is 46.08%.)
155. By comparison, the rate of inclusion for White persons is 53.81% (whose voting registration rate is 82.71%, undeliverable rate is 9.65%, and response not received by the Court rate is 25.29%.)
156. Thus, the jury selection method applied in the Eastern District of Louisiana excludes from the possibility of consideration for jury service 68.20% of Black or African-American persons but excludes only 46.19% of White persons.

CONSIDERATIONS TO INCREASE THE REPRESENTATION OF BLACK OR AFRICAN-AMERICAN PERSONS

157. Some persons are eligible for jury service in the Eastern District of Louisiana that are not included in the process of creating the Master Jury Wheel. The addition of these groups, with effective procedures for ensuring no person is added twice, would increase the likelihood that each eligible person in the Eastern District has the opportunity and shares the obligation of jury service. The more inclusive the source the more likely that by mere arithmetic all groups, both per se cognizable groups as well as economic and less well-known groups, are represented according to their relative sizes in the community.
158. The inclusion of all of the registered voters would increase representation. When there is any inconsistency between what the Louisiana Secretary of State says are registered voters and the voter registration list received, such a discrepancy should be investigated.
159. The inclusion of persons who are eligible for jury service but who are not registered voters would increase representation.
160. The most common supplement to the voter registration list used is the list of drivers' licenses and personal identification cards. In my experience, the inclusion of drivers' licenses and personal identification cards to the voter registration list increases the total merged list by more than 20%.
161. Additionally, the supplementation of the voter registration list with other lists allows for the possibility that more current addresses can be obtained for at least some persons.
162. The procedure for selecting persons from the source list should be reviewed to make sure the process is random. A non-random procedure, such as used for the 2017 Master Jury Wheel, has the effect of reducing the representativeness of the Master Jury Wheel.
163. The Master Jury Wheel in the Eastern District of Louisiana is refilled every four years and supplemented (with the same type of voter registration list) every 2 years after refilling. While this process did not impact the grand jury in this case because the grand jury was selected before the supplementation, the process of supplementation should be reviewed concerning duplicates. Mathematically, a refilling of 60,000 persons and then supplementation of 60,000 persons would likely produce thousands of duplications. The data supplied does not allow for an analysis of duplicates but could be done with voter registration number or name and birthdate.
164. Addresses can be updated using the National Change of Address (NCOA) databases. While this process does not identify or verify all addresses, it can be used to improve the deliverability of some qualification forms.
165. The current practice of following up on responses not received by the Court has been ineffective. The Jury Plan authorizes the use of summonses for persons who fail to return a juror qualification form. Summoning persons whose response to a juror qualification form is not received by the Court, including the personal service of summonses, would help resolve addresses and whether a person has intentionally not responded. It would be expected that summoning would have a specific effect on the

person summoned but would also have a general effect of reducing responses not received by the Court.
166. One practice used by other federal districts is to replace qualification questionnaires that are undeliverable or for which no response has been received by the Court with a replacement qualification questionnaire sent to the same Zip code.

DECLARATION OF RICHARD BOURKE

167. I have reviewed the declaration of Richard Bourke dated January 18th, 2021 in this case.
168. The data used in Mr. Bourke's declaration has been updated and expanded subsequently. I have used the updated and expanded data in this declaration.
169. I agree with the calculations in Mr. Bourke's declaration to the extent that they reflect the data that was available at that time.
170. In section IV, Mr. Bourke calculates the percentage of Black or African-American persons in the group of 131 pools including in the total the number of persons who are not identified racially. In this analysis, I only calculate the percentage of Black or African-American persons with respect to the total number of persons who are identified racially.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated this 23RD day of April 2021

_____ Jeffrey Martin