**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 16-032** |
| **v.** | * | **SECTION: "M"** |
| **LOUIS AGE JR, et al.** | * | |
| | *   *   * | |

**GOVERNMENT'S GLOBAL OPPOSITION TO**
**DEFENDANTS' MOTION FOR DISCOVERY AND FOR LEAVE**
**TO ISSUE PRESS RELEASES SEEKING INFORMATION FROM THE PUBLIC**

**NOW INTO COURT** comes the United States of America, appearing herein through the undersigned Assistant United States Attorneys, and files this opposition to the defendants' Motion for Discovery Pursuant to Rules 16 and 12(B)(4) of the Federal Rules of Criminal Procedure, Rec. Doc. 692,[1] and Motion for Leave to Make Extrajudicial Statement to Request Assistance in Obtaining Evidence, Rec. Doc. 694.

**Introduction**

On the basis of a single interview with a cooperating defendant, JR, who was upset at having just learned that he would be called as a witness in a murder for hire trial, the defendants seek to open an inquisition and issue local and national press releases outing a separate cooperating witness, MC, and seeking information from the public about an alleged plot involving the payment for information in Nelson Coleman jail.   MC denies involvement in a scheme to pay for information.   Importantly, none of the other inmates at Nelson Coleman who are alleged to have participated in the scheme, including JR, have implicated MC's involvement.   Yet the defendants are attempting a massive overreach that would give MC's cooperation national exposure, further

---

[1] After the initial motion was filed, the defense filed a motion to substitute another pleading for the initial pleading, Rec. Doc. 696.   The relief sought appears to be substantially identical.

1

jeopardizing his safety, and create a sideshow rather than simply preparing to try this case.   The Court should reject their efforts and guide this case toward trial.

## Background

JR previously served time in federal prison with Ronald Wilson when both were charged and convicted of federal drug offenses approximately 20 years ago.  When both were again incarcerated on federal charges in the late 2010s they naturally began communicating.  JR, who was accused of drug crimes, eventually decided to plead guilty and cooperate with federal authorities.  He provided information about a person who was buying from him and that person subsequently pleaded guilty.  He provided information about another drug trafficker and when that trafficker found out JR might testify, he also pleaded guilty.  That is, JR's information appeared to be reliable, as the people against whom he provided it admitted their guilt.

In August 2019, JR began providing information to law enforcement that he was learning from Ronald Wilson, who was incarcerated with him.  During one in-person meeting on August 2, 2019, and through five subsequent phone calls to an FBI SA, JR conveyed detailed information about Wilson that was not publicly available.  These jail calls were recorded by the jail's standard call recording system.  Undersigned counsel reviewed the calls before filing this motion and is happy to provide them to the Court if the Court believes they would be useful for its review. The level of detail and specificity of particular events discussed in the calls certainly supports the legitimacy and accuracy of the information first provided by JR on August 2, 2019.

In a February 12, 2020, call to SA Williams, JR told Williams that MC was speaking a lot with Wilson, but that JR could not hear what they were saying because they were whispering. The defense version of events assumes this call was the introduction of MC to the prosecution team in this case, and implies a conspiratorial taint because JR supposedly connected MC to law

enforcement.   But that is not accurate.   As the MC FBI 302 report details, the government initially met with MC on January 14, 2020, approximately a month before JR reported MC's frequent contact with Wilson to law enforcement.   There were two additional calls from MC to SA Williams, on January 21, 2020, and February 10, 2020, that predate the JR call.[2]

In a meeting to prepare for trial in late January 2022, the government informed JR, who has little more than a year left to serve, that he would be called as a witness against defendants accused of murdering a federal witness.   JR showed up to the meeting in a walking boot due to a broken bone, which he stated had occurred when he was attacked by other inmates as a result of his cooperation in another matter.   During this meeting, JR repeatedly advised that he was scared to testify, having just been beaten up in jail, and was concerned for his family's safety, specifically that of his wife.   His prior cooperation had not been public nor involved taking the witness stand. Notably, it was only after JR was informed he would be called as a witness in the upcoming murder-for-hire trial that he then told agents and prosecutors that some of the information he had originally relayed did not come from Wilson but rather from two other inmates, TS and GS.   He acknowledged that he was friends with Wilson and talked with him while they were incarcerated together and that some of the information had come from Wilson.   He specifically indicated that he is not aware of GS or TS providing information to any other inmate except possibly one other person, who is not MC.

Following the interview, the government determined it would not call JR, but nonetheless produced to the defense FBI 302s documenting the incriminating information JR had previously provided and detailing what JR had said about getting some of the information from TS and GS.   After the documents were released in discovery, JR and his attorney both contacted the

---

[2] In fact, it was MC's sister who reached out to one of the Assistant U.S. Attorneys on the case, and conveyed that MC wanted to speak to the government.   This communication occurred on January 6, 2020.

government stating that JR needed to be moved immediately from the jail where he and the defendants were being held pretrial because he feared for his safety after the reports were released.

The government also interviewed TS, GS, and MC about the allegations.  MC denied receiving any of the information he had provided from anyone other than Ronald Wilson.  TS affirmed that the information he had provided about the murder for hire conspiracy was accurate and had come from the defendants and denied participating in any scheme to trade information about the murder for hire conspiracy for protection (or money or any other reason) with JR.  TS noted that JR and Wilson talked regularly.  GS also confirmed he had gotten information about the murder for hire conspiracy from the defendants.  He denied attempting to sell any information to JR.  GS also noted that Wilson was well known in the jail for talking a lot about his case.

### Relevant Procedural History

After the disclosure of the 302s, as well as all the government's most sensitive discovery information, the defense sought a continuance, arguing in a 25-page motion that they needed a week or two more to review the discovery but potentially months to resolve issues related to JR's allegations.  Rec. Doc. 670.  In an effort to get the case to trial, the government affirmed in writing as part of its opposition to the continuance that it would not be calling JR, TS, or GS, despite all three of them having incriminating information about the defendants.  Rec. Doc. 679.  The government agreed to limit the jailhouse witnesses to just MC, who was not alleged by JR to be part of any scheme and who had denied as much when directly questioned about it.  *Id*.  After reviewing the pleadings, the Court granted the defendants an additional two weeks but denied a longer continuance, which implicitly rejected their claimed need for months to conduct additional discovery into JR's allegations.   Rec. Doc. 690.

Undeterred by the Court's limited grant of their continuance, the defendants promptly filed two motions.   The first was a motion for discovery under Rule 16, Rule 12(B)(4), and *Brady*, even though nothing about JR's allegations, even if true, remotely suggests that the defendants are innocent of the crimes with which they are charged.   Rec. Doc. 692.   The second sought leave "to allow defense counsel to release a public statement requesting assistance of the public in obtaining evidence concerning the operation of jailhouse informant MC as a government agent in this and other cases and information reflecting on MC's credibility as a witness" and "to use MC's name in order to request the assistance."   Rec. Doc. 694 at 1.

## Law and Argument

Based on a single interview with a witness who the defendants surely would have been calling a liar had he testified consistent with his numerous prior statements, the defendants seek to undertake something akin to a grand jury investigation but in the public arena.   They also want to publicly identify an incarcerated cooperating witness as part of a local and "national" canvas for information.   It is totally unclear what this canvassing operation would look like, much less result in.   But the government is sure that any tip from the public, regardless of how ridiculous or unreliable, will take on monumental significance to the defense and will be fodder to justify another much longer continuance.   The case will never get off the ground.

The Federal Rules of Criminal Procedure contemplate nothing like what the defendants are requesting.   On the contrary, and in stark contrast to the Federal Rules of Civil Procedure, discovery in criminal cases is narrowly cabined.   *See*, *e.g.*, *United States v. Dowl*, No. CRIM.A. 08-0164, 2008 WL 4544356, at *7 (E.D. La. Oct. 7, 2008) ("As this case highlights, the rules governing discovery in criminal prosecutions are 'far more restrictive' than the analogous rules in federal and state civil proceedings.") (citing *Campbell v. J.M. Eastland*, 307 F.2d 478, 518 (5th

Cir. 1962)); *see also Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case.").

Nevertheless, review of the underlying facts demonstrates the government's ongoing compliance with its discovery obligations and the lack of any *Brady* issue here.   Based on one interview with a defendant who previously had been attacked and injured for cooperating, had no interest in testifying against these defendants, and no motive to do so, given he had only about a year to serve—defendants assume as a given the existence of "a corrupt informant ring [] operating out of [a local jail] involving the manufacturing of false testimony designed to obtain sentencing benefits and the active recruitment of jailhouse informants to work in the ring."   Rec. Doc. 692 at 1.   They applaud the government voluntarily forgoing testimony from JR, TS, and GS, but do not believe this concession blunts the need for their investigation, particularly "because the government disclosures indicate that MC was brought to the government by a self-confessed member of the corrupt informant ring."   *Id*. at 1, 4.

As discussed above, that, of course, is false.   The 302s provided to the defense show MC was initially interviewed about what Wilson had been telling him on January 14, 2020, about a month before the February 12, 2020, call in which JR told SA Williams that MC was talking to Wilson a lot.   Simply put, MC fully debriefed with the government before JR ever mentioned to the government that MC was speaking with and receiving information from Wilson. [3] Furthermore, the defense apparently fails to consider that JR reported he saw Wilson speaking with MC because JR in fact saw Wilson speaking with MC.   Finally, if JR's allegations about his receiving information from others are to be given any credence, JR did not allege MC to have

---

[3]  In this recorded telephone call, JR references a text sent to SA Williams on September 26, 2019.   In the text, JR stated that Wilson wanted to make a call on JR's account, but could not, and instead Wilson made a call on MC's account.

participated in the information sharing scheme, and MC denied getting the information he shared from anyone but Wilson.[4]

The government acknowledges that at various points, TS, GS, JR, MC, and Wilson, among other defendants, were all housed at the same local pre-trial detention facility.   They of course had to be together for Wilson to talk to them about the case.   There is, however, zero basis for the defendants' speculation that the government somehow purposely put all these individuals together so that "inmate agents" working under the government's direction could pump Wilson and the other defendants for information.   The government did not do that.   On the contrary, at his initial meeting with agents and prosecutors on the instant matter, MC detailed the information he learned from Wilson.   MC clearly learned this information from Wilson before January 14, 2020, when he initially met with agents and prosecutors on this case.   Thus, Wilson disclosed the details of his and his co-defendants' scheme before those agents and prosecutors ever had a chance to speak with MC at all, much less have the opportunity to direct MC to interrogate Wilson.   Further, almost every time SA Williams spoke to one of the inmates who was providing information, he admonished the inmate that the inmate could listen but was not to actively solicit information from Wilson, which is consistent with what is permitted by *Massiah*.   Although the defendants refer to these admonishments as "window dressing at best," Rec. Doc. 692 at 2, that same characterization could apply to *Miranda* warnings or any other time law enforcement provides individuals with whom agents are interacting prophylactic warnings about what the law allows.   It is cynical to characterize as "window dressing" legitimate law enforcement efforts to respect inmates' constitutional rights, while still acting within our authority to obtain relevant information from

---

[4] If the defendants' conspiratorial speculation were true and JR introduced MC to SA Williams as part of the alleged scheme, then it would stand to reason that when JR supposedly had a change of heart and disclosed the alleged scheme, he might also have mentioned that MC was a part of it.

incarcerated individuals who hear information about cases from their fellow inmates.

In two repeated headers in their motion, the defendants state that TS and MC "claim to have heard things from one or more defendants but did not disclose that [they were] a part of the corrupt informant ring."   Rec. Doc. 692 at 5-6.   TS and MC do of course claim they got information from Wilson or other defendants, which is why their potential testimony is relevant at all in this case.   But it is bizarre indeed for the defendants to fault them for not disclosing the "corrupt informant ring."   They deny the existence of said ring.   It would hardly make sense for them to disclose something that does not exist.

After their recitation of the supposed background facts, the defendants claim that "[a]n urgent discovery order is needed because the government has been running jailhouse informants at Nelson Coleman [a local jail where federal inmates are detained pretrial] over a course of years and this has now been exposed to be a corrupt informant ring."   Rec. Doc. 692 at 8.   This is quite a leap from the information the government disclosed about what JR said when told he was going to be called as a witness at trial.   The defendants characterize jailhouse informant testimony as "some of the most unreliable" and then support their characterization by claiming that this type of evidence is so dangerous that there is a Fifth Circuit Pattern Instruction addressing jailhouse informant testimony, with no cite of course, since there is not one.   Rec. Doc. 692 at 8.   They then detail the constitutional limits on how jailhouse information can be obtained.   *Id*. at 8-10. Notably, there are limits on how the information can be obtained, not a blanket prohibition, since so many inmates—having little else to do—often talk to other inmates about their cases.   The government understands the relevant case law, and as shown in the reports and recorded calls, instructs and repeatedly admonishes cooperating defendants not to violate the constitution.

The defense then sets out 13 extremely broad (and often unclear) requests for information. In evaluating the requests, the Court must remember that the government has voluntarily agreed not to call JR, TS, and GS, and that only MC will be called.  JR did not allege that MC was involved in sharing of information.   MC has denied he received the information he provided from anyone other than Wilson.   The government anticipates that if asked about it on the stand at trial, MC will testify that he got the information from Wilson, not TS, GS, JR, or any other inmate.

It is not remotely clear how, in the face of a denial from MC on the stand, the defendants would be able to use any of the information they seek.   Under Rule 608(b), extrinsic evidence is generally not admissible for impeachment purposes, and courts are given wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, and the introduction of irrelevant information.  *United States v. Skelton*, 514 F.3d 433, 439 (5th Cir. 2008).

The government assumes that this Court does not want the trial of a case involving the murder for hire of a federal witness to devolve into a sideshow about whether a bunch of inmates who are not testifying did or did not share information, especially when the whole thing is based on one inmate's allegations about information sharing.  Even if the Court is inclined to allow the defense to explore JR's allegations, the discovery requests included in their motion are wildly overbroad and indicative of a fishing expedition, not an effort to obtain particular evidence to use at a murder trial that starts in two weeks.

In addition to their wildly overbroad discovery motion, the defendants also seek leave to issue what they described as local and national press releases identifying MC by name, despite him having several more years to serve in BOP, and soliciting information about MC and the allegations made by JR, which did not include MC at all.   Rec. Doc. 694.

It is almost inconceivable that the defendants believe this is an appropriate course of action based on a single interview with an inmate who when told he was going to be called as a witness based on his detailed incriminating information that was non-public about this case, suddenly came up with a story that part of the information was manufactured.  It is entirely possible, and highly likely, that JR falsely alleged that not all the information came from Wilson because he did not want to testify and had little reason to do so because he had already received a reduction in sentence and had little time left to serve.  JR has already suffered the wrath of fellow inmates based on prior cooperation, and clearly expressed an unwillingness to put himself in a similar situation with defendants who murdered a federal witness.  The defendants' efforts to use the press to solicit information from the public are wholly inappropriate, completely disproportionate to the information that has been provided, and should be denied.

<div style="margin-left:auto">

Respectfully Submitted,

DUANE A. EVANS
UNITED STATES ATTORNEY


*s/ David E. Haller*
DAVID E. HALLER
ELIZABETH PRIVITERA
Assistant United States Attorneys
650 Poydras St., Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3000
Email: David.haller@usdoj.gov

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<div style="margin-left:auto">

*s/ David E. Haller*
DAVID E. HALLER
Assistant United States Attorney

</div>