UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL DOCKET |
| | ) | |
| versus | ) | NUMBER: 16-32-1 |
| | ) | |
| LOUIS AGE JR. | ) | JUDGE BARRY W. ASHE |
| LOUIS AGE III | ) | |
| RONALD WILSON JR | ) | |
| STANTON GUILLORY | ) | |

**MEMORANDUM IN SUPPORT OF**
**MOTION TO EXCLUDE TESTIMONY OF INFORMANT M.C.**
**DUE TO CONFRONTATION CLAUSE VIOLATION**

Defendants Age Jr., Age III and Guillory respectfully submit this memorandum in support of their motion to exclude the testimony of M.C. as to declarations of Ronald Wilson as their presentation at trial for the truth of their contents without an opportunity to cross-examine the declarant violate the Confrontation Clause

**INTRODUCTION**

Nelson Coleman Correctional Center has been exposed as the home of a corrupt jailhouse informant ring.  The government hopes to use a jailhouse informant linked to this corrupt ring, M.C.,[1] to testify in Mr. Age Jr.'s trial about statements deliberately elicited from Ronald Wilson and rely on Wilson's alleged declarations as proof of their contents on the theory that the Confrontation Clause does not guarantee a right to confront this kind of witness.

At the time of the conversations, M.C. was already employed by the government as a jailhouse informant under a plea agreement in which he was seeking a sentencing reduction contingent upon delivering substantial assistance.  Indeed, M.C. had already been serving as a

---

[1] The informant's initials will be used by agreement with the government.

jailhouse informant at Nelson Coleman Correctional Center.  M.C. was twice brought to the attention of the government by a self-confessed member of the corrupt informant ring at Nelson Coleman as a possible source of information; a technique that is stock-in-trade for corrupt jailhouse informants.

The circumstances here mirror those found by the Supreme Court in *United States v. Henry,* 447 U.S. 264, (1980), to represent a government agent deliberately eliciting incriminating statements.

Until 2004 it was inarguable, before or after founding that, that the unsworn, out-of-court statements of a co-defendant, not in furtherance of a conspiracy, were inadmissible at trial.

Indeed, only sixteen years after the Sixth Amendment was ratified, Chief Justice Marshall ruled in the trial of Aaron Burr:

> I know not why a declaration in court should be unavailing, unless made upon oath, if a declaration out of court was to criminate others than him who made it; nor why a man should have a constitutional claim to be confronted with the witnesses against him, if mere verbal declarations, made in his absence, may be evidence against him.

*United States v. Burr*, 25 F. Cas. 187, 193 (1807).

The government contends that in the wake of *Crawford v. Washington*, 541 U.S. 36 (2004), neither the Confrontation Clause, nor the hearsay rules prohibit the use of a government agent to elicit incriminating statements from an incarcerated co-defendant in the absence of his counsel and then offer them for the truth of their contents against the other defendants, all while providing those defendants no opportunity to confront their author.

Since *Crawford* the Supreme Court has adopted the "primary purpose" test to determine whether an out of court statement should be regarded as testimonial.  This test does not depend upon whether the statements are made to a member of law enforcement, though that is relevant, nor is the primary purpose exclusively that of the declarant as opposed to the person eliciting the

statement.

Applying the primary purpose test to a jailhouse informant who is deliberately eliciting statements for use in a future trial it is clear that those statements should be understood as testimonial and protected by the Confrontation Clause.  This is particularly true when it is added that the jailhouse informant is acting as a government agent.  Thus, the statements of M.C as to the declarations of the unavailable witness Wilson must be excluded in the trials of the remaining defendants as violating the Confrontation Clause.

In the alternative, if this court finds that the statements are not testimonial, then this establishes that the Supreme Court's historically flawed adoption of the testimonial/non-testimonial dichotomy has failed and must be abandoned, albeit that pending that abandonment, this court is controlled by binding precedent.

## ARGUMENT

**I.    M.C. was clearly a government agent where he was working on a contingency or bounty basis to come up with jailhouse informant testimony in a facility with an institutionally entrenched and corrupt jailhouse informant ring**

**A.    It turns out that the government has been aware of a corrupt informant ring at Nelson Coleman for some time and that this corruption extends directly into the present case**

*1)  Even before this case, the government knew criminals were selling information to help others falsely claim sentence reductions and that notorious lying informant, Gregory Stewart, was recruiting inmates into a team to work for the authorities*

In 2017, Gregory "Rabbit" Stewart, a notorious murderer and cooperating witness, testified at the trial of Evans Lewis and described how things worked at Nelson Coleman Correctional Center, where he was being held.

Stewart testified that he had been written up by a deputy. Incensed at having received a write-up and not having been protected when he was such an important cooperating witness,

Stewart wrote a letter to the head of security, Lieutenant Norvel Orazio.

In that letter, Stewart threatened to have himself moved to another jail. Orazio would then be in trouble because he would never have anyone like Stewart and the team of inmates that Stewart had recruited to work for Orazio:

> You know if I leave, this jail gonna be mad at you cause you could have took care of that for me. Now you will never have nobody helping you out like me and the team of inmates that I introduced you to. And I feel like you played on me. We'll talk.

Attachment A, 15-154, EDLA, Doc 1403 at 100 - Extract of transcript of testimony of Gregory Stewart, 1/30/2017.

Under cross-examination, Stewart admitted to writing the letter and sending it to Orazio and, while he denied that he and his team of inmates went around telling on other people, he confirmed that he was the important part of Orazio's security arrangements because of how he recruited a team of inmates to work for Orazio:

> Q. You think you're an important part of Orazio's operation over there; right?
> A. I am the important part.
> Q. You think you're an important part; right?
> A. Yeah.
> Q. Okay. Because you run this team of inmates; right?
> A. I don't run no team. I introduce them to him and he run them how he run them.

Attachment A, 15-154, EDLA, Doc 1403 at 106 - Extract of transcript of testimony of Gregory Stewart, 1/30/2017.

By the time of his testimony, Stewart had been promised a Rule 35 sentencing reduction submission by the EDLA U.S. Attorney's Office (though this written promise was suppressed until halfway through Stewart's testimony).[2]

Another Nelson Coleman resident and cooperator testified in the same trial that it was

---

[2] 15-154, EDLA, Doc 1403 (Extensively discussing late disclosure of Rule 35 promise).

4

already well known that a common inmate scheme was to fraudulently pay money for another person to come up with incriminating information on a suspect and then claim credit for the assistance to obtain a sentencing reduction.  Gregory Stewart was specifically named as an inmate who knew about and could explain the scheme.[3]

2) *Past is Prologue: The jailhouse informants in this case, being held at Nelson Coleman, were part of a corrupt jailhouse informant ring, selling information so that inmates could fabricate false testimony, including in this very case*

During the time that defendants in the present case were housed at Nelson Coleman Correctional Center, the government had a team of cooperating jailhouse informants working for them in that facility.

Gregory Stewart, who had been promised a Rule 35 motion by the government and, it appears, has a Rule 35 motion for sentence reduction pending,[4] was housed at Nelson Coleman.

Also housed at Nelson Coleman during the relevant period were J.R., T.S., and M.C.[5]

J.R., T.S., and M.C. were jailhouse informants, acting on behalf of the government pursuant to a pre-existing plea agreement and in an effort to attract a sentencing reduction before sentencing by a 5K motion or after sentencing under Rule 35.[6]

Each of J.R., T.S., and M.C. has claimed to have had incriminating conversations with one or more of the defendants, and the government provided their materials in anticipation of trial.

On January 25, 2022, the Government met with J.R. and he revealed that, although some of the incriminating information he received about Wilson had come from Wilson, a portion of the information regarding the murder-for-hire plot had been given to him by two fellow inmates, G.S.

---

[3] See Attachment A, 15-154, EDLA, Appellate record 634-644.
[4] 11-107, Doc 1039; 1039-1.
[5] Once again, by agreement with the government, initials will be used in place of names drawn from a document under the protective order.
[6] The government has disclosed various 302s, plea agreements, 5K motions and other materials establishing these facts, which will be offered at an evidentiary hearing in due course.

and T.S., while he was incarcerated in Nelson Coleman.  J.R. told government agents that G.S. and T.S. instructed him on what to say regarding a portion of the information he provided on the murder-for-hire plot.  J.R. also revealed that G.S. wanted money in exchange for the information he provided to J.R, and that T.S. wanted to be looked after by J.R. once J.R. got out.

A redacted version of the January 25, 2022, 302 report, where names are replaced with initials, is attached as Attachment C and an unredacted version will be filed with the court under seal pursuant to Rule 49.1(f).

The government disclosed this evidence of a corrupt jailhouse informant ring for the first time on March 4, 2022, without fanfare and included with it sixty-six other documents released that day.  The defense having raised the issue, the government has now stated that it will not call J.R., T.S. or G.S. as witnesses.[7]

Since the March 4 disclosure, defense investigation has disclosed credible information that after his transfer to Nelson Coleman, T.S. sought to recruit others to act as informants, would mine case information to support false jailhouse informant testimony, had recruited J.R. for his ring, and sought money from other inmates for his services in setting up false jailhouse informant testimony to allow access to sentencing reductions.

The government seeks to insulate M.C., its remaining jailhouse informant, from the stench of the Nelson Coleman corrupt informant ring because M.C. says he was not part of it.  This is hardly sufficient and does not alter the relevance of this context to the Confrontation analysis.

**B.    Nelson Coleman jailhouse informant, M.C., was working for the government and deliberately eliciting information from Wilson while also being connected to the corrupt jailhouse informant ring in the facility.**

The government disclosures thus far show that M.C. claims to have had the relevant

---

[7] See Government's Opposition to Continuance. Doc. 679.

conversations with Wilson while both were housed at Nelson Coleman Correctional Center with M.C. becoming closer to Wilson around July 2019.   Corrupt informant J.R. gave S.A. Williams M.C.'s name in September 2019 and the government has now stated that M.C.'s sister called an AUSA to advise he wanted to be seen on January 6, 2020.  The first reported debrief with the government on the M.C./Wilson conversations occurred on January 14, 2020.

M.C.'s own claimed activities must be placed in their chronological context, which shows that M.C. had long been acting as a government informant, paid on a contingent basis with the promise and actuality of enormous sentencing reductions and forbearance from prosecution.  By the time of the alleged conversations, M.C. had long since submitted himself to government control[8] and become a government agent.

Prior to 2018, M.C. was a target in a drug trafficking investigation and the government had received information that M.C. was involved in shipping methamphetamine to the Houma area but had not yet charged him.

Between January 20, 2018 and January 30, 2018, M.C. engaged in three sales of heroin to an undercover informant.   The sales were audio and video recorded and conducted under surveillance.[9]  In short, the government had an open and shut case against M.C. on three counts of distribution of heroin.

On February 22, 2018, M.C. was indicted on three counts of distribution of heroin under 21 U.S.C. § 841, each count carrying up to twenty years.[10]  M.C.'s criminal history involving violence, guns, and flight made him both unsafe for release pending trial and designated him a

---

[8] *Massiah* is triggered not only when an informant acts pursuant to specific instructions from the government, but also when he has "otherwise submitted to the State's control." *Creel v. Johnson*, 162 F.3d 385, 394 (5th Cir. 1998) ("Whether Plangman acted pursuant to instructions from the State, or otherwise submitted to the State's control.").
[9] Factual basis for plea of M.C.
[10] Indictment of M.C.

career offender for sentencing purposes.[11]

Following his arrest, M.C. "immediately agreed to cooperate and meet with the government."[12]   He confessed to his involvement in not only the heroin distribution but also the related methamphetamine distribution, providing details on the supplier of the methamphetamine.[13]   As a part of his cooperation, M.C. was never prosecuted for his role in the distribution of methamphetamine in Houma.

M.C. was involved in multiple debriefing meetings with the government about these matters and prepped for grand jury testimony by the government, though he was not called as a witness for strategic reasons.[14]   "Strategic reasons" in this context often means the government wants to continue to use the informant and does not want his identity to be revealed yet.

By April 16, 2018, a notice of change of plea had been filed and M.C. pled guilty as charged on May 17, 2018.[15]

On May 17, 2018, M.C. signed a plea agreement, five pages of which were filed in the public record and have been provided by the government.  That plea agreement included an under seal attachment, which has not yet been provided by the government, but which is described in the public plea agreement as follows:

> The defendant understands that the statements set forth above and in the attached SEALED document (Attachment "A") represent defendant's entire agreement with the government; there are not any other agreements, letters, or notations that will affect this agreement.

Obviously, this sealed attachment must be disclosed to the defense immediately, but experience in EDLA makes clear that sealed Attachment A to the plea agreement included M.C.'s

---

[11] *See* detention order ordering continued detention because of clear and convincing evidence that M.C. was a danger to others, a flight risk and had a history of using guns and violence. See Government's 5K motion on behalf of M.C.
[12] Government's 5K motion.
[13] Government's 5K motion.
[14] Government's 5K motion.
[15] See docket for M.C.'s case.

agreement to act as a cooperating witness, no doubt with the standard conditions[16] that he:

- assist the government in the investigation and prosecution of criminal conduct of any person;

- immediately advise the government as to any person he believes to be violating the law;

- submit to interviews wherever and whenever requested; and,

- testify as required before the grand jury or at trial.

The undisclosed Attachment A to M.C.'s plea agreement can also be expected to contain the standard language to the effect that the government agrees to bring to the attention of the court any cooperation rendered by M.C. and may, in its sole discretion, move for a reduced sentence for M.C. as a result of his cooperation.

Despite pleading guilty in May 2018, M.C.'s sentencing was then set off for well over a year through a course of multiple settings and re-settings, several of which are attended by sealed filings[17] that have not yet been disclosed by the government.  These must be disclosed.

Experience in EDLA and the language of the Government's 5K motion both make it more likely than not that over a year of these continuances were sought and granted to facilitate M.C.'s ongoing activities as a jailhouse informant.

---

[16] The standard cooperation paragraph appearing in EDLA cooperation plea agreements reads like:

This plea agreement is predicated upon the fact that the defendant agrees to submit to interviews whenever and wherever requested by law enforcement authorities. The defendant understands he must be completely truthful. The defendant also agrees to appear before any Grand Jury or trial jury and to testify truthfully. The defendant understands if he is not truthful, this agreement will be null and void and defendant may be prosecuted for perjury or making false statements. The defendant agrees neither to implicate anyone falsely nor to exculpate or protect anyone falsely. The defendant further agrees to immediately advise the Government as to any person defendant believes to be violating the law and defendant agrees to assist the Government with regard to the investigation and prosecution of criminal conduct of any other person.

[17] It appears that the first two months of delay in sentencing may have been due to the unavailability of the PSI author, but the delay from September 2018 to December 2019 appears to be as a result of continuances designed to facilitate M.C.'s activities as a jailhouse informant.

During the course of 2018, M.C. operated as a jailhouse informant at Nelson Coleman in the case of a wholly unrelated defendant. The government has not yet, but surely must, disclose the 302s and debriefing associated with these previous activities of M.C. as a jailhouse informant at Nelson Coleman that provide the context for his continuation in this role in the present case.

It is in about July 2019 that M.C. later claims he began getting closer to Wilson, setting the stage for his claims that he had detailed conversations with Wilson in which Wilson implicated himself and others in the charged crimes.

In September 2019, corrupt informant J.R. provided M.C.'s name to S.A. Williams by text message as a person allowing Wilson to use his phone.

In November 2019, the government filed its 5K motion, asking the court to impose a sentence on M.C. lower than the bottom range provided by the sentencing guidelines – a downward departure. As the Government's 5K motion points out, the extent of any downward departure is governed by, *inter alia*: the significance and usefulness of M.C.'s assistance; the nature and extent of M.C.'s assistance; and, the truthfulness, completeness, and reliability of the assistance.

Thus, under the government's agreement to report any cooperation to the court and to consider filing a 5K motion, any sentencing benefit was contingent upon M.C. delivering information that was significant and useful, an assessment to be made after the assistance was provided.

In the government's 5K motion, it describes substantial assistance in the drug cases and also that M.C. "tried to assist the government on other cases based on what he learned in prison."[18] The 5K motion describes his assistance as a jailhouse informant at Nelson Coleman in the other case mentioned above. The 5K motion then states, "More recently, [M.C.] has offered information

---

[18] Government's 5K motion.

to the government regarding another active case, but because the Court has indicated that it will not continue M.C.'s sentencing again, any credit for potential assistance in that case, if appropriate, will have to come through later proceedings."[19]  The government cautioned that M.C.'s assistance had not yet risen to the level of substantial assistance but, alluding to a possible future Rule 35 submission to reduce M.C.'s sentence, clearly held out the promise of future benefit if M.C.'s assistance becomes more substantial.[20]

The government has not yet disclosed whether this other "active case" is the present case, nor when the first discussion with M.C. was had about the present case.

According to the government's 5K motion, M.C.'s sentencing range was calculated as being between 151 to 188 months.

On December 4, 2019, M.C. was sentenced to 105 months on each of three counts, each to be served concurrently.  This represents a 44% discount on the sentence M.C. could have received at the top of the Guideline range.

Despite being sentenced, M.C. was not moved to a Bureau of Prisons facility but was instead maintained at Nelson Coleman, likely so he could continue to act as a jailhouse informant for the government.

A month later, on January 14, 2020, M.C. met with SA William Williams and AUSA Elizabeth Privitera and provided an extensive debrief on his alleged conversations with Wilson.[21] The government has not yet disclosed when or in what circumstances M.C.'s activities as a jailhouse informant in respect of this case began or what contacts he had with the government prior

---

[19] Government's 5K motion.
[20] It is customary in these situations of ongoing cooperation not to develop the ongoing assistance in the 5K motion as Rule 35's restrictions on sentence reductions sought after sentencing may tie the hands of the government and the informant.
[21] BSN 535411.

to January 2020 that reflect upon his activities in this case.  The government must surely provide this discovery.

The government has disclosed that over the next few months, M.C. met with the government again in person to continue debriefing and had at least three calls with SA Williams. This is obviously not the entirety of the government's contact with M.C., and given the substantial showing that he was acting as a government agent and had submitted himself to government control, those remaining contacts must be disclosed.

On February 12, 2020, J.R. called SA Williams and describes another guy in the dorm (M.C.) who is sitting on Wilson's bunk and talking every night and provides SA Williams with M.C.'s name as a person to talk to.

Critically, in this conversation, J.R. also revealed that he had previously given SA Williams M.C.'s name by texting the name to SA Williams as a person whose phone Wilson had used to make a call.[22]  This previous text has not yet been disclosed.

Given that pointing law enforcement toward other false jailhouse informants and falsely corroborating each other's contacts with the victim of their activities is stock-in-trade[23] for corrupt jailhouse informant rings, this effort by J.R. to bring M.C. to the attention of SA Williams clearly raises grave suspicions and connects M.C. to the corrupt informant ring.  This earlier contact with SA Williams, referred to by J.R., has not been disclosed nor has this particular text communication or any other text messages between SA Williams and J.R.  The government must immediately disclose these contacts.

## II.     The Confrontation Clause bars the admission of an out of court statement of an unavailable witness where the primary purpose of the conversation was to create an

---

[22] BSN 53967, recorded call of J.R. and SA Williams on 2/12/2020.  First disclosed to the defense at 5:40pm on Friday, March 11, 2022.
[23] See, for example, *Prible v. Davis*, 2020 U.S. Dist. LEXIS 89711, at *46-49, *83-93 (S.D. Tex. May 20, 2020)

out-of-court substitute for trial testimony

1) *The Supreme Court's "primary purpose" test is not dependent upon the declarant's intentions and, in any event, the Confrontation Clause captures attempts to evade the formal interrogation process*

The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

In *Crawford*, the United States Supreme Court held that the Confrontation Clause served to bar the admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 53-54.  The Court in *Crawford* explicitly did not set out to define the phrase "testimonial" in that decision but stated that it included, at a minimum, prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. *Id.* at 68.

The inclusion of police interrogations is important here as it was not dictated by historical example at the time of founding but rather by analogy.[24]  Further, the Court in *Crawford* made clear that it was referring to interrogations in the colloquial, not technical, sense and cited to a passage from an earlier decision defining interrogation as not only express questioning but also any words or action that police should know are reasonably likely to elicit an incriminating response.[25]  The Court declined to define interrogation for Confrontation Clause purposes, noting that one could imagine many definitions and that for the instant case the Court did not need to select among them.[26]  The definition adopted by the Court in *Massiah*,

---

[24] *Crawford*, 541 U.S at 52-53.

[25] *Crawford* at n.4 citing *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980).  Consistent with Supreme Court authority, this court should conclude that populating the federal tier at Nelson Coleman with bounty hunting jailhouse informants was reasonably likely to elicit an incriminating response.  *United States v. Henry*, 447 U.S. 264, 270-271 (1980) ("Even if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result.")

[26] *Id.* at n.4.

dealing with another Sixth Amendment right, includes directly confrontational interrogation as well as "indirect and surreptitious" interrogation.[27]

Over the next decade, the members of the Court grappled with the definition of "testimonial across a number of cases. The Court developed the "primary purpose" test in *Davis*[28] and further defined the contours of that test in cases like *Michigan v. Bryant*, 562 U.S. 344 (2011) and *Ohio v. Clark*, 576 U.S. 237 (2015).

Notably, in *Bryant*, Justice Scalia, who authored the opinion in *Crawford,* was soundly out voted on the question of whose purpose is relevant to establish primary purpose. Scalia J. in his dissent was adamant that primary purpose should be limited to the purpose of the declarant.[29] However, the majority expressly rejected the argument that the primary purpose was assessed from the perspective of the declarant and reaffirmed that a statement's testimonial or nontestimonial nature derives from "the primary purpose of the interrogation." The majority held that in determining the primary purpose of the interrogation, "the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation." *Bryant*, 562 U.S. at 367.

Following *Bryant*, the Court confirmed in Clark that the primary purpose test was to be applied whether the interrogator was a member of law enforcement or a civilian. While an interrogation by a civilian was less likely to have a primary purpose of establishing past events potentially relevant to a criminal prosecution, the court was clear that this was only one factor to consider. Clearly where the "civilian" interrogator is serving as an agent for the government, this factor would weigh in favor of finding  a primary purpose of establishing past events

---

[27] *Massiah v. United States*, 377 U.S. 201, 205–06 (1964)
[28]  *Davis v. Washington*; *Hammon v. Indiana*, 547 U.S. 813 (2006).
[29] *Bryant*, 562 U.S. at 381 (Scalia J. dissenting) ("because the Court picks a perspective so will I: The declarant's intent is what counts.")

potentially relevant to a criminal prosecution.

Further, the protections of the Confrontation Clause cannot be avoided by a prosecutorial device used to evade Confrontation.  There is no doubt that if Wilson's alleged statements had been made in a police interrogation, that they would be testimonial and could not be offered against the other defendants unless were Wilson were called as a witness.  *Massiah* itself stands for the proposition that constitutional protections extend to informal or surreptitious interrogations as much as formal interrogations.  To hold otherwise would encourage and institutionalize evasive prosecutorial tactics and debase the Confrontationright.

Even Justice Thomas, who has taken the narrowest view of what is testimonial, has made clear that the Confrontation Clause "also reaches the use of technically informal statements when used to evade the formalized process."  *Williams v. Illinois*, 567 U.S. 50, 111 n.5, (2012) quoting from *Davis*, 547 U.S., at 838, (Thomas J.) (concurring in part and dissenting in part).

The Fifth Circuit has laid out the primary purpose test as it is to be applied following *Ohio v Clark*:

> A statement is "testimonial" if "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 2274, 165 L. Ed. 2d 224 (2006). In evaluating the statements, courts determine "whether, in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to create an out-of-court substitute for trial testimony." *Clark*, 135 S. Ct. at 2180 (citing *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S. Ct. 1143, 1155, 179 L. Ed. 2d 93 (2011)) (internal quotations and brackets omitted).

*United States v. Barker*, 820 F.3d 167, 170 (5th Cir. 2016).

The Supreme Court has provided guidance on factors to be considered in determining the primary purpose of an interrogation.  Where the interrogation is conducted by law enforcement, the Supreme Court set out the following:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the

interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

*Davis*, at 822. Certainly, if a law enforcement officer had personally carried on the alleged conversations with Wilson there is no doubt they would have been testimonial. It is submitted that M.C. was acting sufficiently as a government agent that the primary purpose of the interrogation should be assessed through this law enforcement lens.

Beyond this framework for law enforcement officers, the Court directed an examination of the actions and statements of both the interrogator and the declarant. *Bryant* (supra); *Clark* (supra). In this case, M.C. entered into a plea agreement with the government to earn sentence reduction by cooperation, acted as a jailhouse informant, inveigled himself into Wilson's confidence over time and then would go and sit on Wilson's bunk to talk with Wilson each night, after which he would debrief with the government and inform his attorney so that a sentence reduction could be requested. Wilson is not alleged to have been making spontaneous utterances , nor was he overheard in conversation with another, he is alleged to have made his declarations in the context of the conversations with M.C..

Given M.C.'s status as an agent of law enforcement, his status as a civilian and the relative informality of the interrogation do not weigh against the conclusion that the declarations should be considered testimonial.

The Court admonished that a district court must consider all the circumstances, and so an evidentiary hearing is inevitably required in this case to allow the court to receive evidence and make findings of fact to support its application of the legal standard to the circumstances of this case.

The question for this court, to be answered after an evidentiary hearing, is whether the

16

conversations between a pre-existing jailhouse informant, M.C., and a pre-trial defendant Wilson, that were then reported seriatim to the FBI for use in the prosecution of Wilson, had a primary purpose of establishing or proving past events potentially relevant to criminal prosecution.

As the recitation of the history of events as known at this time by the defense demonstrates, the answer to this question is unquestionably "Yes!"

### 2) *Fifth Circuit caselaw relied upon by the government is not to the contrary*

The government, in its opposition to continuance (Doc. 579 at 5-6), staked out its claim that testimony such as M.C.'s was not subject to the protections of the Confrontation Clause but a closer examination of that caselaw does not support that position in this case.

First the government cited to a line from the Supreme Court in *Davis* in which the Court stated:

> Where our cases did dispense with those requirements--even under the Roberts approach--the statements at issue were clearly nontestimonial. See, e.g., Bourjaily v. United States, 483 U.S. 171, 181-184, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987) (statements made unwittingly to a Government informant); Dutton v. Evans, 400 U.S. 74, 87-89, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970) (plurality opinion) (statements from one prisoner to another).

*Davis v. Washington*, 547 U.S. 813, 825 (2006).

Of course, the Court in Davis was not adjudicating whether statements of the type at issue here are testimonial. Further, and importantly, the two cases referred to by the Court in this passage involved testimony held admissible because it was found to be a statement of a co-conspirator in the course of and in furtherance of a conspiracy. Such statements call for a completely different analysis under the primary purpose test than a conversation involving an undercover police informant deliberately eliciting incriminating information long after the end of a conspiracy and with the purpose of obtaining information for use in a prosecution so as to earn the informant the bounty of a sentence reduction. The Court's remarks in *Davis* are in no way controlling here.

17

The government principally relies upon the Fifth Circuit's decision in *United States v. Vasquez*, 766 F.3d 373 (5th Cir. 2014) addressing a *Bruton*[30] claim.  Importantly, that case was decided on plain error review and so stands only for the proposition that plain error was not shown. *Id.* at 378 ("Under the plain error standard, Vasquez's argument must be rejected").  Further Vasquez never claimed that the jailhouse confession was anything other than non-testimonial. *Id.* 379.  As such, the *Vasquez* decision does not serve as either binding precedent or even persuasive analysis in the present situation.

Of the decisions from other circuits, most pre-date *Bryant*, where the Court rejected Justice Scalia's narrower view that the purpose of the declarant controls.  Such cases do not have persuasive value and their logic fails in the face of *Bryant* and *Clark*.  Other cases listed while post-dating *Bryant* nevertheless applied language from *Crawford* that was modified by *Davis*, *Bryant* and *Clark*.[31]

As such, the government has not identified any governing Fifth Circuit precedent addressing under the primary purpose test a conversation between an existing jailhouse informant seeking to gather information to buy a sentence reduction and a pre-trial detainee speaking after the completion of the relevant conspiracy.  Nor has the government identified a case that addresses whether, even if such a conversation were technically non-testimonial it would be covered by the Confrontation Clause for the same reason that *Massiah* prohibits surreptitious interrogation as a means of evading other Sixth Amendment protections.

**III.    Even if the alleged declaration of Wilson is held to be non-testimonial, it should be excluded under the Confrontation Clause because the Supreme Court's reliance on**

---

[30] *Bruton v. United States*, 391 U.S. 123, 126-128 (1968).

[31] For example, *United States v. Dargan*, 738 F.3d 643 (4th Cir. 2013) asked "whether the declarant would have expected or intended to 'bear witness' against another in a later proceeding," though that is clearly no longer the applicable test.  As the Fifth Circuit has instructed, following *Davis*, *Bryant* and *Clark*: A statement is "testimonial" if "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Barker* (*supra*).

**the testimonial/non-testimonial dichotomy is not well founded and has proven unworkable in protecting the right to Confrontation**

This court is obviously bound by Supreme Court precedent to apply the testimonial/non-testimonial dichotomy and the primary purpose test.

However if the conclusion of applying that test is that the un-confronted declaration of a co-defendant, as related by a jailhouse informant like M.C., does not implicate the Confrontation Clause then that test must be abandoned as wholly failing to serve the interests protected by the Confrontation Clause.  As Chief Justice Marshall said, "I know not why . . . a man should have a constitutional claim to be confronted with the witnesses against him, if mere verbal declarations, made in his absence, may be evidence against him." *Burr*, 25 F. Cas. 187, 193 (1807).

The testimonial/non-testimonial dichotomy has long been criticized by historians and legal scholars as not accurately relying upon the historical record to discern the intent and scope of the Confrontation Clause.[32]  Further, even if the *Marian* statutes were the principal evil at which the Confrontation Clause was directed, they were not the only concern, as Chief Justice Marshall's admonition in *Burr* reminds us.

While it is not open to this court to overturn Supreme Court precedent, the Supreme Court should revisit its analysis of the Confrontation Clause to the extent that the current analysis exempts from the protection of Confrontation the type of prosecutorial tactic employed here.

## CONCLUSION

For all of the foregoing reasons, the Court should conduct an evidentiary hearing prior to the commencement of trial and then make the requested fact finding and grant this Motion to

---

[32] See George Fisher, *The Crawford debacle*, 113 Michigan Law Review First Impressions 17, 19-22 (2014); *Crawford*, 541 U.S. at 69 (Rehnquist CJ, dissenting) ("The Court's distinction between testimonial and nontestimonial statements, contrary to its claim, is no better rooted in history than our current doctrine.")

exclude the testimony of M.C. as to the declarations of Wilson in the trials of Age Jr., Age III and

Guillory in the absence of an opportunity to confront and cross-examine the declarant.

Respectfully submitted,


*/s/ Richard Bourke*
Richard Bourke, LA 31428
Christine Lehmann LA 28122
Julia Chung LA 39142
Attorneys for Louis Age, Jr.
Louisiana Capital Assistance Center
636 Baronne Street
New Orleans, LA 70113
504-558-9867
504-558-0378 (fax)

Attorneys for Louis Age, Jr.

## CERTIFICATE OF SERVICE

This certifies that I electronically filed the foregoing pleading with the Clerk of Court by

using the CM/ECF system that will send a notice of electronic filing to all counsel of record.

Dated:  March 15, 2022

*/s/ Richard Bourke*
RICHARD BOURKE